IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| AMERICAN FAMILY MUTUAL INSURANCE COMPANY, | ) ) ) | |
| Plaintiff, | ) ) ) | |
| v. | ) ) | 05 C 3839 |
| BONNIE L. ROTH, d/b/a BONNIE ROTH AGENCY, CONNIE S. ROTH, d/b/a CONNIE ROTH AGENCY, and ROTH AND ROTH INSURANCE AGENCY, INC., d/b/a ROTH AND ROTH INSURANCE, | ) ) ) ) ) ) ) | Judge Ronald A. Guzmán |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

American Family Mutual Insurance Company ("AFMI") has sued Bonnie L. Roth, d/b/a Bonnie Roth Agency, Connie S. Roth, d/b/a Connie Roth Agency, and Roth and Roth Insurance Agency, Inc., d/b/a Roth and Roth Insurance (collectively "the Roths") for violation of the Wisconsin Trade Secrets Act, Wis. Stat. § 134.90(1)(c), violation of the privacy rights of its clients under the Gramm-Leach-Bliley Act, 15 U.S.C. § 6801 *et seq.*, as well as breach of contract and tortious interference with prospective business expectations. AFMI moved for preliminary injunction, a motion which the Court referred to Magistrate Judge Jeffrey Cole for a Report and Recommendation ("R&R"). The Roths now object to portions of the R&R in which Magistrate Judge Cole recommended that the Court grant AFMI's motion for preliminary injunction to prevent the Roths from using certain trade secret information. For the following reasons, the Court rejects the Roths' objections and adopts Magistrate Judge Cole's R&R in full. The Court grants the motion for a preliminary injunction and enjoins the Roths from using the

1

names contained in Exhibit 34 as well as all other information in Magistrate Judge Cole's report to which they have not objected.

## FACTS

AFMI is a Wisconsin corporation in the business of selling insurance. (Compl. ¶ 2.) The Roths were AFMI's exclusive agents. (*Id.* ¶¶ 7-9.) Bonnie Roth was an agent for AFMI for over two years and Connie Roth was an agent for AFMI for nearly eight years. (*Id.* ¶¶ 7-8.) The Roths both independently signed exclusive agency agreements with AFMI at the beginning of their respective agencies. (*Id.* ¶ 9.) The agreements stated that all copies of materials and supplies furnished by AFMI and produced by the Roths as agents for AFMI would remain AFMI's property. (*Id.* ¶ 11.) The agreements also acknowledged that the database provided by AFMI was confidential, proprietary, and trade secret information and that the Roths would not disclose any of the information contained in the database except in the course of their business as agents for AFMI. (*Id.* ¶ 14.) The agency agreements stated that any leads on prospective clients the Roths found while AFMI's agents were AFMI's property. (Ex. 17.) Further, the agreements further declared that Wisconsin law would govern any disputes that arose between the parties. (*Id.* ¶ 12.)

AFMI maintains a computer database for the exclusive use of its agents in order to facilitate the sale of insurance to customers. (*Id.* ¶ 14.) The database contains confidential information regarding active, inactive, and prospective clients for AFMI. (*Id.* ¶ 17.) The names that are entered into the database are pre-screened in order to assess the person's suitability to buying insurance. (Def.'s Resp. Objections 10.) Only the names of people who are likely to buy insurance or who have already purchased insurance from AFMI are entered into the database.

*Id.* This database is a big source of AFMI's business and AFMI allows only its agents to access the database. (Compl. ¶ 22.) The database is highly secure and AFMI spends millions of dollars each year to maintain the security of the database. (*Id.* ¶ 25.)

On February 11, 2005, an employee of AFMI met with the Roths to discuss some concerns. (R&R 8.) On February 15, 2005, AFMI sent the Roths individual letters informing them that their agencies had been terminated. (Compl. ¶ 32.) Between February 11 and February 14, 2005, the Roths began downloading massive amounts of information from AFMI's database that amounted to more than 1,700 pages of documents. (R&R 8-9.) On February 17, 2005, AFMI sent individual letters to the Roths warning them that the information downloaded from the database was confidential and the property of AFMI pursuant to the agency agreements. (Compl. ¶ 33.) Around May 21, 2005, AFMI received a complaint from one of its clients that he was being solicited by the Roths using confidential information that could have only come from the database. (*Id.* ¶¶ 34-37.) AFMI filed a formal complaint against the Roths with the Illinois Division of Insurance stemming from this incident and this suit followed. (*Id.* ¶ 39.)

On August 5, 2005, after presiding over a two-day hearing and reviewing the parties' briefs, Magistrate Judge Jeffrey Cole issued an R&R that recommended that the Roths be enjoined from using any information they had obtained from AFMI's database including 1,847 names in Exhibit 34. The Roths object to portions of the R&R.

## DISCUSSION

Pursuant to Rule 72(b), a magistrate judge assigned to hear a pretrial matter dispositive of a claim or defense "shall enter into the record a recommendation for disposition of the matter, including proposed findings of fact when appropriate." FED. R. CIV. P. 72(b). Motions for

injunctive relief are dispositive. 28 U.S.C. § 636(b)(1)(A). Within ten days, a party may make "specific, written objections to the proposed findings and recommendations." FED. R. CIV. P. 72(b). "The district judge to whom the case is assigned shall make a *de novo* determination . . . of any portion of the magistrate judge's disposition to which specific written objection has been made." *Id.* "[I]n providing for a '*de novo* determination' rather than *de novo* hearing, Congress intended to permit whatever reliance a district judge, in the exercise of sound judicial discretion, chose to place on a magistrate's proposed findings and recommendations." *United States v. Raddatz*, 447 U.S. 667, 676 (1980).

In order to obtain a preliminary injunction, the plaintiff must show a likelihood that it will prevail on the merits of the suit, that there is no adequate remedy at law, and that it will suffer irreparable harm without injunctive relief. *Incredible Techs., Inc. v. Virtual Techs., Inc.*, 400 F.3d 1007, 1011 (7th Cir. 2005). However, the plaintiff need only demonstrate a "better than negligible chance of succeeding" on the merits. *Cooper v. Salazar*, 196 F.3d 809, 813 (7th Cir. 1999). Once the requirements for a preliminary injunction are met, the Court must further balance the degree of irreparable harm to the plaintiff if the preliminary injunction is wrongfully denied against the harm that the defendant will suffer if the preliminary injunction is wrongfully granted. *Id.* A stronger showing of likely success on the merits permits a weaker showing on the balance of harms posed by the grant or denial of the preliminary injunction. *Bloedorn v. Francisco Foods, Inc.*, 276 F.3d 270, 298 (7th Cir. 2001). In addition, the Court must also consider the effect the injunction will have on the public. *Promatek Indus., Ltd. v. Equitrac Corp.*, 300 F.3d 808, 813 (7th Cir. 2002).

Under Wisconsin law, no person may misappropriate a trade secret by:

(b) Disclosing or using without express or implied consent a trade secret of another if the person did any of the following:

4

> 2. At the time of disclosure or use, knew or had reason to know that he or she obtained knowledge of the trade secret through any of the following means:
>
>> b. Acquiring it under circumstances giving rise to a duty to maintain its secrecy or limit its use.

Wis. Stat. § 134.90(2)(b). The statute further provides that injunctive relief is available to protect against violation of the statute. Wis. Stat. § 134.90(3).

Because the Roths' objections focus on whether AFMI has a likelihood of success on the merits, the Court likewise limits its discussion. First, the Roths argue that Magistrate Judge Cole's findings of credibility with respect to their testimony were erroneous. Second, they assert Magistrate Judge Cole misinterpreted Exhibit 34 as a 187-page customer list instead of an email solicitation sent by the Roths to 1,847 people thereby obscuring his further analysis. Third, the Roths contend Magistrate Judge Cole mistakenly concluded that AFMI's database is the source of the names contained in Exhibit 34 and that the names are protectable trade secrets under Wisconsin law. Fourth, they maintain that Wisconsin insurance regulations require them to keep records of the information contained in Exhibit 34 as well as other information downloaded from AFMI's database. The Court does not find merit in any of these objections and further finds that AFMI has a better than negligible chance of succeeding on the merits of its case at trial.

## I. Credibility of the Roths' Testimony

The Roths object to the portions of the R&R that find their testimony to be incredible. While the district court is required to make a *de novo* determination on findings of credibility, the district court is neither required to reject the magistrate judge's findings nor required to conduct another hearing to review the magistrate judge's findings or credibility determinations.

5

*United States v. Raddatz*, 447 U.S. 667, 675 (1980); *United States v. Severson*, 49 F.3d 268, 273 (7th Cir. 1995). A review of the record reveals numerous instances where the Roths' testimony is incredible and where their explanations for their actions are too convenient and self-serving to be accepted. Thus, the Court finds that much of the Roths' testimony is incredible and adopts Magistrate Judge Cole's findings as to their credibility.

One of the most prominent examples of the Roths' lack of credibility stems from their explanations for printing out more then 1,700 pages of information from AFMI's database. All of this printing took place systematically over the course of three days immediately after the Roths knew they were "on the way out" as agents for AFMI. (R&R 8.) Both Bonnie and Connie Roth claimed that they did not know why they printed off all of these documents, and Bonnie Roth further claimed that the information was "of no utility to [her]." (*Id.* 24-25.) The Roths' only reply to the questioning of this testimony's credibility is that "[m]any times people don't understand their own motivations for the things they do." (Defs.' Objections 4.) The Roths are experienced businesswomen, and the Court finds it incredible that they spent three days downloading 1,700 pages of information that was of no use to them.

Another prominent example is Bonnie Roth's explanation as to what happened to fourteen separate categories of policies she downloaded on February 13, 2005. Bonnie Roth testified that she does not have these reports because her printer ran out of ink while she was printing them. (*Id.* 7.) This contention makes little sense in light of the fact that the Roths continued to download and print documents from AFMI's database through the following day in the range of 1,000 additional pages. (Pl.'s Resp. Defs.' Objections 4.) Again, the only argument offered by the defendants on this point is that the Court ought to believe their testimony. (Defs.' Objections 7.) In light of the fact that the Roths printed out more then 1,700 pages of documents

and that many more pages of documents were printed subsequent to the ink allegedly running out, the Court finds it incredible that the Roths would have been deterred by running out of ink and that the testimony on this subject was intended to conceal the fact that they actually have the documents.

A final prominent example of the Roths' lack of credibility stems from Connie Roth's testimony regarding the May 19, 2005 solicitation of an AFMI client. The Roths' solicitation contained confidential information that only could have come from AFMI's database. (Compl. ¶ 36.) When questioned by the client, Connie Roth denied "copying" the information from the database, but at the hearing testified that she did not lie to the client because she had "printed" the information, not "copied" it. (Pl.'s Resp. Defs.' Objections 4-5.) The Court finds that this type of gamesmanship when taken in the context of the other instances of incredible testimony illustrates the Roths' general dishonesty regarding the facts at issue.

The record is filled with many more specific instances of the defendants giving incredible and disingenuous testimony and the above examples are simply some of the more egregious. (*See generally* R&R 23-31.) For the above stated reasons, the Court finds the Roths' testimony incredible and adopts Magistrate Judge Cole's findings on all credibility issues.

## II. Exhibit 34

The Roths object to the Magistrate Judge Cole's characterization of Exhibit 34. Magistrate Judge Cole mistakenly describes Exhibit 34 as a 187-page list containing the names of AFMI's active and prospective customers. (*Id.* 32.) However, the Court has reviewed Exhibit 34 and has found it is an email letter sent by the Roths in an effort to solicit clients along with a 38-page list of the email addresses and names of the 1,847 people to whom the solicitation was

sent. (Defs.' Reply Pl.'s Resp. Attach. 1.) It is clear that Magistrate Judge Cole reviewed the subject matter contained in Exhibit 34 and, as explained below, properly analyzed its source and trade secret status.

### III. Trade Secret Status of Exhibit 34

AFMI has a better than negligible chance of proving that Exhibit 34 contains trade secret information under Wisconsin law. There are two issues underlying whether Exhibit 34 contains trade secret information. The first issue is whether AFMI's database is the source of the 1,847 names contained in Exhibit 34. The second issue is whether the 1,847 names are trade secrets.

#### A. The Source of Exhibit 34

The Court finds that AFMI's database is the likely source of the 1,847 names contained in Exhibit 34. AFMI argues, and its witness testified, that 85 of the first 100 names on the list of names in Exhibit 34 are also found in its database and that the high percentage of overlap proves the database is the source of the names. (Pl.'s Resp. Defs.' Objections 6-7; R&R 29.) The Roths raise three arguments in an effort to show that the database is not the source of the list. (Defs.' Objections 3.) First, they argue that together they only serviced 1,050 clients as agents for AFMI and thus it is impossible for 85% of the names on the list to be AFMI's policyholders as it contends. (*Id.*) The Roths maintain that since they only served 1,050 clients, the highest percentage of names in Exhibit 34 that could be AFMI policy holders is 57% (*i.e.*, 1,050/1,847 equals 57%). (*Id.*) Second, they argue that the typeface and format of the names in Exhibit 34 are different from those contained in the database and thus the names in Exhibit 34 could not have originated from the database. (*Id.*) Third, the Roths contend that they purchased all of the

8

names contained in Exhibit 34 from an outside source and then stored them in their own email database. (*Id.*)

First, the Court finds that the Roths' argument that Exhibit 34 could not possibly share 85% of its names with AFMI's database unpersuasive because it mischaracterizes the type of information contained in the database. The database not only contains active policyholders, but, it also contains inactive and prospective policyholders that have been screened for their suitability in purchasing insurance from AFMI. (R&R 28-29.) The Roths argue that because they only serviced 1,050 clients while acting as the AFMI's agents, their email list could only share 57% of the names. (Defs.' Objections 3.) However, upon inspection of an attachment to the Roths' own reply to AFMI's response brief, 119 out of the first 133 names in Exhibit 34 are also found in the database when including inactive and prospective policyholders. (Defs.' Reply Pl.'s Resp. Objections Attach. 1.) The Court finds that 133 names is a representative sample of the list as a whole. This sample shows that 90% of names in Exhibit 34 are shared with the database and is much more consistent with the percentage argued by AFMI. Further, this argument concedes that every single client the Roths serviced while agents of AFMI is contained on the list which, as discussed *infra*, may be enough to make the list a protectable trade secret in and of itself. Thus, the Court finds that approximately 90% of the names on the list in Exhibit 34 also appear in the database.

Second, the Roths seem to argue that because the font and format of the names in Exhibit 34 is different from those in the database, they must come from different sources. (Defs.' Objections 3.) Simply because someone copies information into a different format and changes the font does not mean that it is not the same information. The Court therefore rejects this objection.

Third, although the Roths argue that they purchased the names from an outside source, the Court does not credit that contention. The Court agrees with the Magistrate Judge's finding incredible "the Roths' claim that the customer list . . . was merely a list of prospects that they developed through purchases of lists from outside vendors." (R&R 29.) The Roths have produced no evidence that shows that they purchased these names from outside vendor other than their own testimony. In light of the other credibility issues discussed *supra*, the fact that 90% of the names in Exhibit 34 appear in AFMI's database, and the fact that Magistrate Judge Cole did not credit this argument, the Court finds the Roths' contention that they purchased all of the names in Exhibit 34 to be incredible and further finds that AFMI has a better than negligible chance of proving its database is source of the names in Exhibit 34 at trial.

### B. Whether Customer Lists Are Trade Secrets Under Wisconsin Law

AFMI has a better then negligible chance of proving that a customer list like the one contained in Exhibit 34 is a protectable trade secret under Wisconsin law given that its database is the source of the list. The Roths only object to Magistrate Judge Cole's finding that Exhibit 34 is a trade secret under the statutory definition. (Defs.' Objections 8.) No objection has been made to Magistrate Judge Cole's determination that Exhibit 34 was misappropriated if it is indeed a trade secret. Thus, the following analysis will be limited to whether Exhibit 34 is a trade secret under the Wisconsin law. In Wisconsin, "trade secret" is defined as:

> Information, including a formula, pattern, compilation, program, device, method, technique or process to which all of the following apply:
>
> 1. The information derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use.

2. The information is the subject of efforts to maintain its secrecy that are reasonable under the circumstances.

Wis. Stat. § 134.90(1)(c).

A brief history of the trade secret status of customer lists is helpful. Prior to the enactment of Wis. Stat. § 134.90, the Wisconsin Supreme Court held that all six factors in the Restatement (Fourth), Torts, § 757 must be applied when deciding whether a customer list is a trade secret and that an insurance company's lists of names and addresses of policyholders, their renewal dates, and their amounts of coverage were not trade secrets. *Corroon & Black-Rutters v. Hosch*, 325 N.W.2d 883, 886-87 (Wis. 1982).

After the enactment of § 134.90, in *Minuteman, Inc. v. Alexander*, 434 N.W.2d 773, 779 (Wis. 1989), the Wisconsin Supreme Court held some customer lists could be afforded protection under § 134.90 and that the "the *Corroon* [Restatement] test no longer embodies the definition of [a] trade secret." The *Minuteman* court did, however, hold that the Restatement factors are still "helpful" in determining whether a document is a trade secret. *Id.* at 778.

Following *Minuteman*, the Wisconsin appellate court in *ECT International, Inc. v. Zwerlein*, 597 N.W.2d 479, 482, 485 (Wis. Ct. App. 1999), held that a software distributor's customer lists and prospect lists used in the design and documentation of electrical systems were trade secrets under § 134.90 and broke the statutory definition into three parts. First, the information "must be information such as a formula, pattern, compilation, program, device, method, technique or process" that is "in substantive form . . . generally not known to others in a particular trade." *Id.* at 482. Second, the information must have "independent economic value, available from only one source" such as a customer list in a sector of the economy where identical or nearly identical products are being sold to a small group of purchasers. *Id.* at 483-84. Third, the information must be "subject to reasonable efforts to maintain its secrecy" where

11

confidentiality agreements are sufficient evidence of reasonable efforts to maintain secrecy if they plainly inform the employee that the employer's information is confidential. *Id.* at 484.

The Court holds that AFMI has a better than negligible chance of succeeding at trial because the information contained in Exhibit 34 satisfies the *ECT International* factors. First, the information is substantive in that the names are filtered for their suitability to buy insurance and are not generally known to others because they are subject to regulation by AFMI. (Def.'s Resp. Objections 10.) Second, the names in the database also have independent economic value because the insurance industry is an economic sector where a nearly identical product is being marketed to specific consumers and there is testimony on the record that it costs AFMI less to market insurance to people in its database than it does to market to the public in general. (R&R 37.) Third, the information in the database is subject to reasonable efforts to maintain its secrecy because AFMI made both Bonnie and Connie Roth sign agency agreements which required strict confidentiality and limited the use of the information from the database to the furtherance of AFMI's business. (*See* Ex. 2, 5.)

In *B.C. Ziegler & Co. v. Ehren*, 414 N.W.2d at 52-53, the Wisconsin appellate court held that a securities underwriter's list that identified persons who had made investments and had sufficient money to make subsequent investments was a trade secret. The court held that the list involved "specialized information" that was not "merely a function of record keeping . . . . but was in a significant sense a vital asset of the business upon which efforts and money were expended in its own right." *Id.*

As in *B.C. Ziegler*, AFMI's list contains specialized information that is a vital asset to its business because the names of the clients are screened by AFMI for their suitability for buying insurance and are the best source of business for the AFMI. (Def.'s Resp. Objections 10.) Thus,

*Ehren* supports the conclusion that AFMI has a better then negligible chance of succeeding at trial.

In *Burbank Grease Services, LLC v. Sokolowski*, 693 N.W.2d 89, 96 (Wis. Ct. App. 2005), the Wisconsin appellate court found it unnecessary to decide whether the customer lists involved were a trade secret because the names were readily available by proper means. The *Sokolowski* court found that anyone in the plaintiff's business, given its limited scope, could find potential customers from a phone book because the business was limited primarily to restaurants. *Id.* at 96-97.

*Sokolowski* is factually distinguishable from the case at bar. Unlike in that case, the scope of AFMI's business is exceedingly broad and any outside party would literally have to call every number in the phone book in search for potential clients.

The Roths provide little law in support of their position that a customer list is not a trade secret. The law that the Roths do provide is inconsistent with the current state of Wisconsin law.

First, the Roths argue that *Corroon* is controlling because it is factually similar in that both cases deal with the insurance industry. (Defs.' Objections 7-8.) As discussed above, however, the mandatory six-factor Restatement test enunciated in *Corroon* was disavowed by the Wisconsin Supreme Court in *Minuteman*, 434 N.W.2d at 779. Further, the Roths did not explain how the six-factor test, when applied to the instant facts, would lead to a different conclusion and thus have waived the argument.

Second, they claim that the decision in *Steenhaven v. College Life Insurance*, 460 N.E.2d 973 (Ind. App. Ct. 1984), is factually similar to the case at bar. In *Steenhaven*, an Indiana

appellate court held that customer lists are only protected when the product market is small and fixed. *Id. Steenhaven* is inconsistent with Wisconsin law because the Wisconsin appellate court in *Sokolowski* held that a small, fixed product market was grounds for not protecting a customer list, whereas the Indiana appellate court in *Steenhaven* held that a small, fixed product market was the only grounds for protecting a customer list as a trade secret. *Compare Sokolowski*, 693 N.W.2d at 96-97, *with Steenhaven*, 460 N.E.2d at 973.

Third, the Roths contend that the decision in *UBS PaineWebber, Inc. v. Aiken*, 197 F. Supp. 2d 437 (W.D.N.C. 2002), is also very similar to the case at bar. In *PaineWebber*, the Western District of North Carolina relied on a North Carolina state court decision which held that customer lists are not protectable trade secrets. *Id.* at 447. *PaineWebber* is also inconsistent with Wisconsin law because the court in *PaineWebber* held that customer lists are never trade secrets, whereas it is clear that customer lists under certain conditions may be trade secrets under Wisconsin law. *Compare PaineWebber, Inc.*, 197 F. Supp. 2d at 447, *with Minuteman*, 434 N.W.2d 773.

For all of the above reasons, the Court rejects the Roths' objections. The Court finds that AFMI has a better than negligible chance of succeeding on the merits of the claim that Exhibit 34 contains protectable trade secret information under Wisconsin law at trial.

**IV. The Wisconsin Regulation**

The Roths argue that Wisconsin Administration Code Commissioner of Insurance Stat 601ff Reg. Ins. 6.61 requires them to maintain a record of the information contained in Exhibit 34 and other documents that they printed out. (Defs.' Reply Pl.'s Resp. Objections 4.) However, this argument was not brought forward at the hearing over which Magistrate Judge

Cole presided or in the Roths' Objections to Magistrate Judge Cole's R&R. "Efficiency in judicial administration requires that all arguments be presented to the magistrate judge in the first instance. The review procedure thus does not afford the opportunity to present new arguments not raised before the magistrate judge." *Balachowski v. Boidy*, No. 95 C 6340, 2000 WL 1365391, at *10 (N.D. Ill. Sept. 20, 2000) (Guzman, J.), *Dynamic Force v. Dynamic Force, Ltd.*, No. 98 C 5922, 1999 WL 342407, at *5 (N.D. Ill. May 14, 1999); *see United States v. Howell*, 231 F.3d 615 (9th Cir. 2000); *Murr v. United States*, 200 F.3d 895 (6th Cir. 2000). Thus, the Court does not have to entertain this objection and finds no compelling reason to do so. "The review procedure is not an opportunity for counsel to present new arguments when the ones first tried fail." *United States v. City of Rock Island*, 182 F. Supp. 2d 690, 694 (C.D. Ill. 2001).

## CONCLUSION

For the foregoing reasons, the Court adopts Magistrate Judge Cole's recommendation that a preliminary injunction be issued against the Roths' use of any information downloaded from American Family Insurance Company's database including the names contained in Exhibit 34. American Family may file a proposed order outlining the terms of the injunction within ten days of the date of this Memorandum Opinion and Order.

**SO ORDERED:**            **ENTER:**   7/27/06

HON. RONALD A. GUZMAN
United States Judge