54757-35-61

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**

| | |
|---|---|
| AMERICAN FAMILY MUTUAL INSURANCE COMPANY, | |
| Plaintiff, | |
| v. | |
| BONNIE L. ROTH, D/B/A BONNIE ROTH AGENCY, CONNIE S. ROTH, D/B/A CONNIE ROTH AGENCY, AND ROTH AND ROTH INSURANCE AGENCY, INC., D/B/A ROTH AND ROTH INSURANCE, | NO: 05 C 3839 |
| | Judge Ronald A. Guzman |
| | Magistrate Jeffrey Cole |
| Defendants. | |

**PLAINTIFFS' RESPONSE TO DEFENDANTS' MOTION TO AMEND THE
PRELIMINARY INJUNCTION ORDER TO EXCLUDE EXHIBIT 34**

American Family Insurance Company, et al ("AFM") by and through its attorneys, James P. DeNardo and Sara E. Cook of McKenna Storer, for its response to Defendants Motion to Modify the  Preliminary Injunction Order(Motion) states as follows:

**I.      INTRODUCTION**

This is the Defendants' (collectively sometimes referred to as the "Roths")  third attempt to relitigate the same point concerning the entry of the preliminary injunction against Defendants enjoining their use of Exhibit 34. This identical issue is pending before the Seventh Circuit on appeal. In 2005, the Roth's copied literally thousands of pages of documents from American Family the weekend before the Defendants'  exclusive agencies with AFM  were terminated.  Using the

information the Roths had gained as exclusive agents for American Family, the Roths began making solicitations of the listed names, including one solicitation using confidential information of an insured. Their conduct and subsequent testimony about it was disingenuous at best and the Magistrate quite accurately so found in finding them to be incredible and less than forthcoming in defending their actions. After a full hearing, the Magistrate prepared a 52 page Report and Recommendation (R & R) to the District Court recommending the entry of a preliminary injunction enjoining the use of Exhibit 34 because it is a protected trade secret of American Family. Docket #35. The District Court adopted the entirety of the recommendation and added its own findings about the lack of credibility of the Defendants and the propriety of the entry of injunctive relief. Guzman Mem. Op., Docket #61. The Defendants objected to the protection afforded Exhibit 34 by the Magistrate's R & R, they filed an appeal which is pending, and they have now filed a motion to try and change the injunction. This motion is no more well founded than the Defendants' position at the hearing or their Objection to the R & R , and it should be denied in its entirety.

## II.     FACTS

The Agent Agreements signed by the Roths contain the following relevant provisions:

> 4.      You (Agent) Agree: ....

***

> (l.)    That all copies of policies, endorsements, policy records, manuals, materials and supplies furnished you by the Company shall be and shall remain the property of the Company and you shall be deemed the bailee thereof for the use and benefit of the Company and shall keep and preserve such property except as consumed in normal agency operations. When this agreement is terminated, you shall deliver within 10 days to the Company all such property together with all copies thereof in your possession and control.

2

\* \* \*

6.      Mutual Agreements.

(k.)  For a period of one year following termination of this agreement, you will not either personally or through any other person, agency, company or organization directly or indirectly induce, attempt to induce or assist anyone else in inducing or attempting to induce any policyholder of the Companies credited to your account at the time of termination to lapse, cancel, replace or surrender any insurance policy in force with the Companies.  In the event the "period of one year" conflicts with any statutory provisions, such period shall be the period permitted by statute.

Appendix A to R & R, Uncontested Findings of Fact, para 11, Docket #35. As part of their agency relationships with American Family, the Roths also signed Endorsement 10, which permitted them to have access to American Family's database ("Database Agreement").

The Database Agreement for the Roths contains the following provisions:

"The Company agrees: 1.  To provide format and participate in maintenance of the data base and make it available to the agent during the term of this agreement and 2.  To grant to the agent subject to the rules and regulations determined and published from time to time by the Company, during the term of this agreement, (a) the right of access to the system through a terminal in the agent's office for use in the agent's professional work for the Company; (b) a limited exclusive, nontransferable license to use the software and the data base, in the performance of the agent's professional work for the Company. ...

The agent agrees to submit all new business and changes through the system as directed by the Company. ...

the agent agrees that software and database provided under this agreement contains confidential, proprietary and trade secret information and that the agent and its employees will not use nor disclose to third parties such information unless in the ordinary course of the agent's business with the Company."

The Database Agreement governed the Roths' access to American Family's proprietary computer

3

system, software and databases ("ADS Computer"). Trial Exhibits 4, 5; Uncontested Findings of Fact, para. 14.

American Family has caused the ADS Computer System to be developed and maintained for its exclusive use in servicing its customers. Uncontested Findings of Fact, para 15, 19. The ADS computer system, software and related databases were developed for and by American Family for its sole use in handling prospects, Inactive and Active policyholders and their respective policy needs. Through the ADS, the Roths had access to their own active, inactive and prospective customers. Guzman Mem. Op., p. 2-3.

American Family had policy and procedures regarding the maintenance and privacy of information contained within the customer files, including the maintenance of original applications, and protecting the privacy of all information contained therein in compliance with federal law. R&R, p. 6; Guzman Mem. Op., p. 12; Uncontested Findings of Fact, para. 20.

American Family's intranet website contained the company security policy which states in pertinent part:

> American Family is the sole owner of all ideas, concepts, programs, data or other results of employment-related or contract-related efforts (unless otherwise stated in the contract). This includes work performed on Company time as well as job-related work prepared during off-duty hours. Trial Exhibit 17, pages 24-25.

The Roths had access to, and notice of, the contents of the intranet website at all times during their agency with American Family. Uncontested Findings of Fact, para. 27.

American Family has expended substantial money and resources to develop this ADS Computer system for use by its employees and agents on a need to know basis. American Family

4

employs a staff of people who work full time in maintaining and managing the ADS Computer System. American Family expends approximately 3 million dollars a year in maintaining the ADS Computer System. R & R, p. 6, 38-39.

The database contains customer lists and related information. The database contains the following information that is not available from public sources: the identity of Active and Inactive policy holders who in fact have purchased policies of insurance; their phone numbers and addresses; the exact policies sold; the insurance needs or potential needs of the policyholder or other prospects; family member information, including information about minors; and asset and financial information including lenders, detail about ownership of property, dates of birth of policyholders and insureds, information about insurance risk and information regarding premiums. Similar information was contained on prospective policyholders. All information available through the computer system is confidential and is not publicly available in this form from other sources. R & R, p. 6, 8, 23.

The intranet website stated that an agent can only collect information from customers to be used in the company's business. The intranet website further cautioned that the names and addresses of customers could not be shared without written consent from the customer, and sharing customer lists with another insurer or agency violates federal privacy laws. R & R, p. 39.

Contrary to company policy, Bonnie and Connie maintained a separate database of American Family policyholders and prospects on an internet site called "Email Concepts". (Tr. 179; Guzman Mem. Op., p. 8-10.)

Despite the fact American Family had gone to great lengths to provide a protected environment for customer information, Bonnie and Connie used this additional site to input customer information, including names and email addresses of prospective, active and inactive American

5

Family Customers. Mass emails could then be sent from this website and in fact were sent out by the Roths from the website. The Roths' E-Mail Concepts database contains 1847 names, all of which were active, inactive and prospective American Family customers on the date of the Roths' termination. Exhibit 34 The Court found the likely source of this list to be the American Family Database. Guzman Mem. Op., p. 8-10.

III.     **The Magistrate and District Court have Properly Found That Exhibit 34 Is a Protected Trade Secret and is Owned by American Family.**

Defendants' contention that the Magistrate did not address the threshold issue of the ownership of the misappropriated trade secrets is simply wrong. The Defendants raise this issue at page three of their Motion. The Magistrate specifically addressed the rights of American Family to Exhibit 34 finding that the Roths misappropriated the information on Exhibit 34 from American Family.

Magistrate Cole and Judge Guzman found that the Roths misappropriated the information in Exhibit 34 largely from the American Family database. See Report and Recommendation ("R&R") pages 9, 26, 28, 29, 31, 42; Guzman Mem. Op., p. 8-10. At page 42 of the R & R, the Magistrate held the information was not only misappropriated, it was concealed from American Family and when confronted with their misconduct , the Defendants glibly lied at the hearing and retreated behind "semantic punctiliousness" to justify that deception. The R&R further outlines how the Roths used the the misappropriated material in an attempt to take business away from American Family. R&R p. 50.

6

**A.    The Roths' Objection to the R & R Previously Filed Does Not  Support Their Current Position  in the Motion to Modify.**

In their Answer and Amended Answer to the Amended Complaint, the Roths admit that the Database Agreement included trade secret protection against disclosure of the database information, that the Agreement governed the use of the Database and that the information contained in the database was developed by AFM for their exclusive use in servicing customers and their policy needs.  See Answer  and Amended Answer, Paragraphs 14, 15, 16. Docket #88,  93; Uncontested Findings of Fact, 14, 15, 19.   The Objection to the R & R ("Objection") filed by the Roths did not argue that American Family is not the owner of the data subject to the trade secret or, more specifically,  the data in AFM's database. Docket #42. Both the Magistrate and the  Court found that the AFM database was substantially the same as the data on the rogue internet database.    The District Court adopted Magistrate Cole's clearly reasoned finding that the information in the internet database belonged to AFM  and was a trade secret.

Now, however, the Roths take a contrary position saying AFM does not own the data which was put into Exhibit 34 .  There are several problems with this position.  First, the Motion to Modify miscites  the Roths' Objection. In the Objection, the Roths did not take the position that AFM was not the owner of the database information contained in Exhibit 34, only that Ex 34 was  not "misappropriated " because it was never contained in the American Family database. Objection p, 6. Docket #42.  The entire paragraph on page three of the Objection, partially cited at page 3 of the Motion, confirms that in their Objection the Roths argued only that Exhibit 34 was taken from the Roth internet database and that it is not a trade secret.   In this Motion to Modify, the Roths are now claiming that everything they entered into the database while exclusive agents of AFM was not property of AFM, even if it also appears in AFM's database or was entered during their exclusive

7

agency with AFM.

In their Objection, the Roths took a position exactly opposite their position in the Motion. They admitted that AFM owned the databases. At page eight of the Objection, the Roths stated "[t]here is no question about the plaintiff's (American Family) database being American Family's property, together with all the printouts made from it." The Roths identified the real question as whether Exhibit 34, compiled by the Roths in an internet database outside the AFM system, can be claimed as a trade secret by American Family when it was not *printed* from the AFM computer. They did not argue that the database was not American Family's *property*. Like their suggestion that the computer screen notice of confidential and proprietary information related only to the technical software on the computer, not the data, they once again try to parse the issue literally to support their conduct. See R&R n. 28 p 28.

The reality is that the information in Exhibit 34 is almost entirely the same information as in the AFM database. Tr. 277; Guzman Mem. Op., p. 8-10. At all times, the Roths' agreement required them to enter all information developed for American Family into the AFM database. See Endorsement 10. Endorsement 10 did not permit them to enter the information into a rogue database to the exclusion of the AFM database. So even if Exhibit 34 contains information that was not in the AFM database, which is at best a very small portion of the data (see *discussion infra*), that information should have been in the AFM database if the Roths were honoring their fiduciary and contractual responsibilities to input all information into the AFM database system. Tr. 277, 324-25; See Endorsement 10. The Roths testified that no entries had been made to the rogue database after their termination as agents with AFM. Tr. 280

This is a shifting of legal positions. The Roths cannot have it both ways. Judge Shadur has

often referred to the "colorful mend your hold" doctrine to explain that you cannot change your litigation position to suit the needs of the litigant at different stages of the case. See e.g. <u>Scherer v. Rockwell International Corporation</u>, 766 F. Supp. 593, 600 n.7 (N.D. Ill 1991). Even if the facts in this case do not fit neatly into the *mend your hold* doctrine, the principal remains that the Roth's are bound by their admissions in pleadings filed with the Court. The introduction of new counsel should not afford them an opportunity to reinvent the wheel.

Moreover, the status of Exhibit 34 is the very issue to be decided in this appeal. Injunctions may be modified on appeal only to preserve the status quo, but not to modify the issues to be decided on appeal. <u>Prudential Real Estate Affiliates, Inc. V. PPR Realty</u>, 204 F.3d 867 (9th Cir. 2000) "[A]fter appeal a trial court may, if the purposes of justice require, preserve the status quo until decision by the appellate court....But it may not finally adjudicate substantial rights directly involved in the appeal." <u>Newton v. Consolidated Gas Co</u>. *258 US 165, 177 (1922);* <u>United States v. El-o-Pathic Pharmacy</u>, 192 F.2d 62,79 (9th Cir. 1951). This modification clearly exceeds preserving the status quo. Further, the Defendants have misconstrued the import of F.R. Civ. Pro. 62 which permits modification only to provide security to maintain the status quo of the adverse party.

The Defendants have conceded that the database is AFM property. On page six of their Objection they argued only that Exhibit 34 was not "misappropriated" because it was physically never contained in the American Family database. Magistrate Cole ruled that the Roths did misappropriate the information in the database and that that misappropriation resulted in a "theft" by the Roths of American Family's database property. R & R, p 42. The Roths should not be allowed to belatedly change their litigation position.

**B.     The Court Has Correctly Found That AFM Owned the Information in Exhibit 34.**

There is no factual or legal basis for the Roths' position that AFM was not the owner of the database. Both the Magistrate and Judge Guzman ruled that the contracts governing the parties relationship clearly identify the agents' input into and the database as property of American Family. See R&R pp. 5,6; Guzman Mem. Op. pp 1-2. Docket #61. In contrast, the defendants have not pointed to any provision in any document which gives them any rights in Exhibit 34. The District Court found that there was no legal basis for any contrary finding. Looking at the contracts and database agreements, the high percentage of customers duplicated on both lists, the lack of credibility of the Roths, the District Court properly agreed with the Magistrate on this point. See Guzman Mem. Op. p. 1-2, 8-10. Judge Guzman held that the agency agreements stated that all copies of materials supplied by American Family and "produced by the Roths" as agents of American Family "would remain American Family's property" and that any leads on prospective clients that the Roths found while they were American Family agents were "American Family's property." Guzman Mem. Op. p. 1-2.

C.     **The Roth's Admission of AFM Ownership and the Law Undermine Their Claim That the Injunction Should Be Modified.**

In their Objection, the Roths admitted that American Family owned their databases. Their position in their Motion that the information developed by the Agents and added to the database is not part of the ownership rights of American Family is simply wrong. Why would AFM structure an agreement that would limit its ownership rights to information people *other than* active agents put in the database? Why would AFM require its agents to input all information into the database, spend millions protecting it, and then allow the agents to retain ownership rights in the database

10

information when they leave the agency relationship? The Defendants position on pages 6-9 of their Motion is again an effort to impose a contorted interpretation to justify their conduct, not unlike their distinction between "copy" and "print" or the curious assertion, already rejected by the Magistrate, that the privacy banner on the computer was to protect only computer hardware and computer program software codes, not data. See R&R, 27, n. 28 p. 28.

In order to circumvent the clear evidence that AFM is the owner of the trade secrets, the Roths attempt to suggest that they have a share of ownership in Exhibit 34. They contend that AFM does not have exclusive ownership of the database. This argument fails on both bases. First, the Roths have no share in the ownership of this material, and even if they did, there is no requirement of exclusive ownership before a trade secret can be found.

The Roths try to create an impression that they independently created all of the contacts in the rogue database contained in Exhibit 34 and that their purchased databases are a viable source of contacts that are included in Exhibit 34. This is simply contrary to the evidence. First, the Roths were the beneficiaries of 2000 transferred policies from other departing agents. Tr. p. 40. Second, AFM provided support services for marketing. Finally, the Roths admitted that their purchase of lists from outside sources was of marginal value at best. See R&R pp 22-23, n.25 Comparisons of Exhibit 34 to other lists stolen by the Roths reveals that 85-90% of AFM customers or potential customers are listed. This lends little credence to the idea that the Roths developed all of these contacts. See R&R , p. 29; Guzman Memo. Op., p. 9-10.

Moreover, the bottom line is that the input of the exclusive agents of AFM is the property of American Family. The Defendants try to diminish the clear testimony of the Illinois State Director for AFM that the data included in the database is owned by AFM. Incredibly, after having

had both the Magistrate and District Court make factual findings about the incredibility of the Roths, the Roth's try to suggest that the testimony of the Illinois State Director for AFM is incredible and should not be accorded any weight. There is no basis for this assertion other than the Defendant's naked claim. The State Director, however, was not impeached on this point nor was she even meaningfully challenged on this point of ownership. No doubt this is because until recently, the Roths had not disputed ownership of the data in the database.

Although counsel complains about the leading question that elicited this testimony, the State Director went on to explain why the information was confidential and proprietary:

> Q. Okay Once that information is in the database though, why does American Family want it to be kept confidential?
>
> A. ...But there is a another very important reason to, and that is this is our future,. This is our –these were our policyholders. These are out clients. This is how we collect our premiums, how we make our money. These—this information represents who we can purchase—who is going to purchase policies from us in the future. Yeah, it is extremely important to us. Tr. p. 66-67.

Notably, a case that the Defendants do not discuss was handled by the same counsel now representing the Roths. In that case, Mr. Tedards advanced the identical ownership argument he advances at page five of his Motion. The Court when considering this issue stated:

> Because of the clear allocation of ownership of the trade secrets in the Agent's Agreements to State Farm, defendants necessarily argue that the contractual language should be disregarded. Their overriding argument is that State Farm's contractual ownership of the trade secrets should not be honored because defendants did the work necessary to acquire the trade secrets. According to defendants, it is State Farm's agents, operating as independent contractors, who "develop policyholder information in the ordinary course of their business, at their own effort and expense, using their own methods, with no contribution, direction, or control by State Farm." Because it is the agents' labor that produces the information, defendants argue, the agents should be found to own the information thereby developed. There is no legal doctrine, however, that authorizes a court to ignore the terms of an unambiguous, integrated contract simply because an argument can be developed that the contract as drafted unfairly allocates benefits and obligations. On the contrary, courts cannot

12

relieve parties of contracts they entered into merely because the contracts embody bad bargains. (<u>M.F. Kemper Const. Co. v. City of L.A.</u> (1951) 37 Cal.2d 696, 703 (copy attached)

<u>State Farm Mutual Insurance Co. V. Wier</u>, 2004 WL 2988429, review denied. (Copy attached). Like the State Farm Contract, the contract in this case is unambiguous about ownership of data developed by an agent.  See Agent Agreement and Endorsement 10.

Defendants argue that there is no fiduciary duty owed by the Roths to AFM.  The defendants signed  Endorsement 10 which specifically acknowledges that the database is a trade secret and proprietary to AFM. Therefore, even though AFM had elaborate security policies in place and a very sophisticated computer system into which the Defendants were required to put all information, it was, under the Roths theory, not a breach of any fiduciary duty to create a second database consisting in large part of information in the AFM database and store it off site where AFM could not get it. This overlooks the fact that the definition of misapproportiation under the Uniform Trade Secrets Act includes the unauthorized disclosure of information or use of secrets. <u>Ed Nawogroksi Insurance, Inc. v. Rucker</u>, 137 Wash2d 427 (1999).  The Magistrate properly found the database information in Exhibit 34 to be stolen, an  unambiguous violation of their fiduciary duty.  R&R pp. 29, 42.

This finding is supported by the policies and agreements  of AFM which made clear that the database information was to be used for limited purposes, and was a trade secret of AFM. *Id*. at 42. Inputting trade secrets from the AFM database into the rogue database that produced Exhibit 34 cannot erase the trade secret character of the information or the duty of the Roths to protect it.  Any contrary holding would eviscerate the very concept of a fiduciary relationship and would open the door for agents to engage in self dealing.

Defendants reliance on <u>Thyroff v. Nationwide Mutual Insurance Co</u>. does not compel a

different result. 460 F. 3d 400 (2nd Cir. 2006). Applying New York law, the court found that the language of an agent's contract did not support the insurance company's ownership of the data on a proprietary database. In that case, the company had seized the data in dispute and the agent was suing on a conversion and breach of contract theory to have his property returned. The court in Thyroff does not quote the language of the Nationwide contract, so we do not know what language it is interpreting. It is clear however, that the contract was at least ambiguous about the ownership of the data on the computer system.

Similarly, the Nationwide Mutual Insurance v. Bland case cited by Defendants is inapposite. 2003 WL 23354137. In that case, decided under Connecticut law, the insurance company sought to enforce a substantially different contract against its exclusive agents. The Court found that the insurer's failure to have significant security procedures governing agents handling of customer information prevented a summary finding of a trade secret. Instead, the case had to be presented to a jury.

In contrast, in this case the agents had controlled and limited access to database information, they were required to keep all information in the AFM database, and they were to return all information at the conclusion of their relationship with AFM. See Agent Agreement; Tr. p. 42-44; Endorsement 10. AFM for its part, spent substantial sums creating a secure and limited access database which protected its interest in the database contents. R & R, p 6.

The AFM agent contract is unambiguous. It clearly states that the data will be the property of AFM, beginning with the agreement to hold all "policies, endorsements, *policy records*, manuals, and supplies" as bailed property. The Agreement and Endorsement 10 permitted access to the database owned by AFM provided the Defendants kept *the trade secrets* contained in the *database*

14

confidential. R&R p. 6. If the data was not owned by AFM, why would the Roths agree to maintain its *proprietary* and *trade secret status* as they did when they signed Endorsement 10? Further, if the data was not owned by American Family why would AFM have an agreement governing *access* to the information? How can AFM control *access* if it is not the owner? Finally, if AFM did not own the data inserted into the system by the agents, why would AFM have this elaborate security system to protect *inter alia* the proprietary and trade secret status of the data and require that all agents agree that they are exclusive agents working for the company and bailees of the company's property?

Defendants' claim that the data is not *exclusively* owned by AFM is contrary to the facts. Furthermore, exclusive ownership is not a requirement stated anywhere in the cases the Defendants cite. The cases cited at pages 3-5 of their Motion make reference to ownership, but they do not include references to any requirement of exclusive ownership, whatever that implies. None involved contracts and agreements as present in the instant case. Only two of the cases involved customer lists and trade secrets Exclusive ownership is not only not required, it is a concept contrary to some of the methods for elevating a list to trade secret status. See <u>Fidelity Fund v. DiSanto</u>, 347 Pa. Super. 112, 121-22(1985). See also <u>Venango River Corporation v. Nipsco Industries, Inc</u>. 1994 WL 702759, *10 (N.D. IL1994), cited at page5 of Defendants' Motion. (Confidential information can be compiled or acquired by the corporation. "Information compiled by employees or officers in the course of a company's business belong to the company, not the individual."). Several of the cited cases involve trade secrets which are processes used in manufacturing. *Exclusive* ownership is not mentioned. See e.g. <u>Rohm and Hass Company v. ADCO Chemical Company</u>, 689 F.2d 424, 429-31 (3d Cir. 1982) cited at page 4 of Defendants' Motion; <u>Licorish v. Exxon Corp</u>. 1985 WL 659753, *1 (E.D. Pa. 1985), cited at page 4 of Defendants' Motion; <u>Eaton Corp. V. Appliance Valves Corp</u>.

526 F.Supp. 1172 (N.D. Ind. 1981), cited at page 3.  Moreover, as discussed supra, the Defendants have already admitted AFM's ownership.

Finally, the Roths complain of American Family's Proposed Preliminary Injunction Order which was not entered.   The Roths insist that the proposed order which raised violations of fiduciary duty as a basis for relief is somehow implicated in the inclusion of Exhibit 34 in the injunction. Whatever AFM said in a proposed preliminary injunction order that was not adopted is beside the point.  The Court adopted the Magistrates R&R in its entirety and added some findings of its own in overruling objections. This is where all attention must be focused. The Magistrate found that the Roth's  fiduciary duties  as agents  were breached and formed part of the basis for relief under the Trade Secrets Act. This was an appropriate finding and does not support the modification of  any relief to the defendants.

WHEREFORE  based upon the forgoing, movant prays that this Court deny all requested relief requested, and grant such further relief as may be equitable and just.

Respectfully submitted,

AMERICAN FAMILY MUTUAL INSURANCE COMPANY

By:    /s/ James P. DeNardo

James P. DeNardo, ARDC 00614688
Sara E. Cook, ARDC 03126995
Kristin D. Tauras, ARDC 06216004
McKenna Storer
33 North LaSalle Street, Ste. 1400
Chicago, IL 60602
(312) 558-3900

**<u>CERTIFICATE OF SERVICE</u>**

       I hereby certify that on November 10, 2006, I electronically filed the foregoing with the Clerk of the U. S. District Court, for the Northern District of Illinois using the CM/CEF e-filing system which will send notification of such filing to the following e-mail addresses:

Wallace C. Doolittle
Law Offices of Wallace C. Doolittle
1260 B Street, Suite 220
Hayward, CA 94541
(510) 888-0600
FAX: (510) 888-0606
wdoolittle@doolittlelaw.com

William P. Tedards, Jr.
1101 30th Street. N.W., Suite 500
Washington, D.C. 20007
(202) 797-9135
FAX: (202) 797-9139
stephanie@tedards.com

David Corbett
Corbett & Corbett
800 E. Northwest Highway, Ste. 700
Palatine, IL 60074-6513
(847) 705-3839

                           McKENNA STORER

                           By: _/s/ James P. DeNardo_____
                           James P. DeNardo
                           Sara E. Cook
                           33 N. LaSalle St., Ste. 1400
                           Chicago, IL 60602
                           (312) 558-3900
                           FAX: (312) 558-8348
                           jdenardo@mckenna-law.com
                           scook@mckenna-law.com

17

18