54757-35-61

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**

| | |
|---|---|
| AMERICAN FAMILY MUTUAL INSURANCE COMPANY, | |
| Plaintiff, | |
| v. | NO: 05 C 3839 |
| BONNIE L. ROTH, D/B/A BONNIE ROTH AGENCY, CONNIE S. ROTH, D/B/A CONNIE ROTH AGENCY, AND ROTH AND ROTH INSURANCE AGENCY, INC., D/B/A ROTH AND ROTH INSURANCE, | Judge Ronald A. Guzman |
| | Magistrate Jeffrey Cole |
| Defendants. | |

**PLAINTIFF'S MOTION FOR RULE TO SHOW CAUSE AND OTHER RELIEF**

American Family Mutual Insurance Company ("Am Fam"), Plaintiff by and through its attorneys hereby moves this Court for a Rule to Show Cause issued to the Defendants ("Roths"), to explain why they should not be held in contempt of court and for other relief. In support of this motion, the Movant states:

*I.*     *INTRODUCTION.*

On July 14, 2005 a TRO was entered against the Roths enjoining their solicitation of Am Fam customers assigned to their agency. This TRO was renewed on July 21, 2005 and a hearing on a preliminary injunction was held on August 2-3, 2005. At the conclusion of the hearing, Magistrate Cole stated that TROs after 20 days turn into a preliminary injunction, and the parties are operating under some sort of injunction, and while Judge Guzman is considering this, "you're going to be under this injunction." (Exh. A, Hearing Tr. 249-250). The Defendants agreed to be bound by the terms of the TRO pending the District Court's ruling on the Magistrate's Report and Recommendation. *Id.* at 457. On August 10, 2006 a preliminary injunction was issued enjoining the Roths from all

1

contact with American Family Customers and requiring information about contacts already made. (Docket #67).

The documents produced and the testimony given during discovery in this case demonstrate that the Roths contacted American Family active customers within two weeks of the hearing on the Preliminary Injunction. The Roths made these contacts after the Magistrate's Report and Recommendation was issued which recommended the entry of a preliminary injunction based on the theft of Am Fam's trade secret: the Am Fam customer lists. In August, 2006 a preliminary injunction was entered and the Roths still did not comply fully. Information has been withheld, and copies of Am Fam Customer lists have not been returned. As more fully described herein, the Roths' persistent violation of the Court's orders and their counsel's agreement is contemptuous, and a rule to show cause should be issued.

## II.      *FACTS.*

This suit was filed on June 30, 2005 by plaintiffs alleging *inter alia* violations of the Wisconsin Trade Secrets Act ("WTSA"), breach of a covenant not to solicit active policy holders, and  for injunctive relief. A motion for a Temporary Restraining Order was filed with the complaint, and the court entered a Temporary Restraining Order restraining the Defendants from contacting any active policy holders assigned to the Roths upon their termination which mirrored the non-solicitation provision of the Roths' contract. (Docket #14). The TRO was renewed and remained in effect through the hearing on the Preliminary Injunction in front of  Magistrate Judge Cole. (Docket #26).

At the hearing in front of Judge Cole on August 2 and 3, 2005, Am Fam introduced evidence that just prior to their termination as Am Fam agents, the defendants had taken literally thousands of pages of documents reflecting the active, inactive and prospective policy holders of Am Fam. On August 5, 2005, the Magistrate issued a 52-page Report and Recommendation to the District Court recommending that the Court enter a preliminary injunction enjoining the Defendants from contacting any persons who were prospects, active or inactive

policyholders (collectively "Customer") of Am Fam because such information was a valid trade secret of Am Fam. (Docket #35). The Magistrate recommended that the Defendants be prohibited from using all information, including Exhibit 34 which the Magistrate described as a "rosetta" stone. Exhibit 34, a list of 1847 names, which mirrored the records the Roths inputted into Am Fam's database. The data in the Exhibit was maintained on the Roths' separate internet website known as "Email Concepts" and was designed to facilitate mass emails that appear to be personalized. The database was completely outside the security controls of Am Fam. Magistrate Cole found this list, Exhibit 34, to be the trade secret of Am Fam.

Defendants testified at the preliminary injunction hearing that the database, as represented by Exhibit 34, only contained names and email addresses, and a few addresses and phone numbers. (Exh. A, Tr. p. 302). In documents produced by the Roths and the testimony of Bonnie Roth at her deposition on April 3, 2007, the Roths have admitted the database also contains addresses, phone numbers, and sometimes dates of birth, and spouses' names. (Exh. B, Bonnie Roth Dep. Tr., p. 9-10 and Exh. C). Further, as was recently disclosed, the database contains separate categories labeled active policyholders for Bonnie Roth and active policyholders for Connie Roth, and an additional category for inactive/prospective policyholders. (See discussion *infra*).

During the hearing before Magistrate Cole, the Defendants testified that there was no mechanism for identifying categories of actives, inactives and prospects; and they had not done so. The list, Bonnie Roth insisted had no insurance information. (Exh. A)(Tr. 318). At the injunction hearing, the Defendants testified that they only desired to keep Exhibit 34, that all other materials had been returned to counsel for the Defendants.

As the hearing was drawing to a close, the following colloquies concerning the documents and future conduct of the Roths took place:

> "**Mr. Daley**: [counsel for the Roths] If in fact what they are looking for here is an injunction enjoining my clients from violating federal law, as I can represent on behalf of the Court we will stipulate to

3

such an injunction, in other words, we will – we will agree to be enjoined from violating HIPAA. We will agree to be enjoined from violating GLB. These are imposed restrictions that are made by federal law. We have to live by them.

And this whole issue of credibility here of these witnesses to me just doesn't–it doesn't make sense. We're now in front of a federal court. And if somewhere down the line it is shown that these ladies have used information that they shouldn't have used or information that they shouldn't have used in the past, we're now under a microscope. And I'm here before this Court substituting my credibility, my partner's credibility, and the credibility of my law firm making representations concerning where documents are and what has been done with them, and it is inconceivable to me that anyone would risk the sanctions that are available to a federal district court in a situation like that.

I don't want to get off on that, your Honor, because I want to get back to the central issue in this case." (Tr., p. 423).

* * *

**Mr. Daley**: "Our customer lists–and in particular, I don't want to overstate what Exhibit 34 is. And are we contending that Exhibit 34 is the only thing that's at issue in this case." (Tr., p. 424).

* * *

**[The Court:]** "And it is because you say everything has been returned or destroyed."

**Mr. Daley**: "That is correct, your honor. And certainly there has been no competent evidence to the contrary." (Tr. , p. 425).

**[The Court:]** "Now I think–I mean, I'm not–I really–I take Mr. Daley at what he said. It really would be insane for Bonnie and Connie Roth to be fooling around at this point in time. I think there probably is injunctive relief. And if Judge Easterbrook's opinion is right, this has turned into a preliminary injunction. *And I think your folks ought to conclude that they are still under order of the court not to do what the TRO did.*

**[Mr. Daley:]** We have so advised them.

**[The Court:]** *And I will take you all at your word that this–nothing is going to happen between the time Judge Guzman gets this and he makes a decision one way or the other.* And I am confident that isn't going to happen. I assume you have that confidence as well --

4

**[Ms. Cook]**: counsel for Am Fam Yes, your Honor.

**[The Court]**: –Ms. Cook?

**[Ms. Cook]**: If counsel has represented that --

**[The Court]**: Yeah, and I --

**[Ms. Cook]**: –I am perfectly comfortable." (Tr., p. 457).
(Emphasis added.)

See Exhibit A.

On August 10, 2006, this Court adopted the report and Recommendation of the Magistrate in its entirety and entered a Preliminary Injunction stating that the defendants:

> "1.  ...are enjoined from using for any reason any information downloaded from American Family Insurance Company's database, including the names contained in Exhibit 34.
> 2.  are enjoined from servicing American Family customers.
> 3.  are required to disclose to American Family the American Family customers contacted since February 11, 2005 and the customers who have responded to the solicitation.
> 4.  are required to return to Am Fam all materials in their possession related to American Family customers, ..."

(Docket #67. See Exhibit D).

In August, 2006, the Defendants filed a Motion for Clarification seeking to obtain information from Am Fam so they could know the identity of the people they could not contact. This motion was later withdrawn. (Docket #73, 75. See Exhibit E.)

In the fall of 2006, present counsel substituted for the prior attorneys representing the Defendants. (Docket #80).

In Am Fam's interrogatories served upon Defendants on October 27, 2006, Am Fam asked the for the following damage information and in January 2007 received this response from the Defendants:

> "4.  Identify all solicitations for business of any type and in any form sent to American Family Policyholders by any defendant between February 15, 2005 and the present, the parties to whom such

solicitations were directed, and the identity of any American Family Policyholder who responded to the solicitation in any way. Further, identify all persons involved in the preparation of such solicitation. ANSWER: See Answer to Interrogatory Number 1.

ANSWER to Interrogatory No. 1: Defendants object to the interrogatory in that they cannot identify American Family Policyholders until Plaintiff provides them *with a list of same, and on the basis of vagueness of the term 'solicitations'*, but without waiver they sent a letter to people they have listed in their own proprietary database, and received responses from several of them, which documents are provided in Defendants response to Plaintiff's Request to Produce. (See Exhibit M).

III.     *THE PRELIMINARY INJUNCTION VIOLATIONS.*

The moving party on a Motion for Rule to Show Cause must show, by clear and convincing evidence, that a violation of the injunctive orders has occurred. *FTC v. Cleverlink*, 2006 WL 3106448 (N.D. Ill. 2006). In this case there is ample evidence of violations of both the first injunctive order which automatically became a preliminary injunction after 20 days (see discussion *infra*) and the second preliminary injunction order entered by the Court.

A.     *USE OF INFORMATION AND CONTACTING AMERICAN FAMILY CUSTOMERS - VIOLATIONS OF THE ORDER WHICH BECAME A PRELIMINARY INJUNCTION AND VIOLATION OF THE AGREEMENT OF COUNSEL.*

It is unambiguous that at the preliminary injunction hearing counsel agreed that the Roths would maintain the status quo established by the temporary restraining order, would not violate the Gramm Leach Bliley Act and would not have possession of the Am Fam documents while this matter remained under advisement with the District Court, and would not use the information that was the subject of the preliminary injunction hearing. In reliance on those remarks, counsel agreed that no further orders were required, and the Court noted that the TRO would automatically convert to a preliminary injunction while the matter remained pending and that while Judge Guzman is considering this, "of course,

6

you're going to be under this injunction." (Exh. A. Tr., p. 249-250). The Roths were present for the entire discussion.

The law in the Seventh Circuit is clear. The agreement to comply with a TRO beyond the 10-day time frame converts the TRO to an appealable preliminary injunction. *In re United Airlines, Inc.*, 406 F. 3d 918, 923 (7th Cir. 2005)(Easterbrook, J.). *See also Bethune Plaza Inc. v. Lumpskin*, 863 F.2d 525, 528 (7th Cir. 1988)(A TRO may be deemed a preliminary injunction if it lingers beyond the days); *Chicago United Industries, Ltd. v. City of Chicago*, 445 F.3d 940, 943 (7th Cir. 2006)(TRO kept in force by the district court for more than 20 days without the consent of the parties is deemed a preliminary injunction and is appealable). In documents produced in March, 2007 and Bonnie Roth's testimony, it is clear that the Defendants used Exhibit 34 repeatedly throughout the time from the conclusion of the hearing in front of the Magistrate and to the entry of the Preliminary Injunction to solicit American Family customers. (See Exh. F and Exh. B, pp. 30, 58-60, 86, 100). This was done after a detailed opinion was entered calling their credibility into question and recommending that they be enjoined from using all Am Fam materials, including Exhibit 34. (Docket #35). Further, it was done after their own attorney had stated unequivocally that they would not use the documents during the pendency of the proceedings, he was literally staking his firm's credibility on that representation.

Bonnie Roth's admissions, counsel's admissions and simple math make it clear that Exhibit 34 was used for at least 13 mailings between August 5, 2005 and August 10, 2006. (See Exh. F, Exh. B, pp. 30, 58-60, 86, 100). Since Bonnie Roth admits that Exhibit 34[1] contains all of the names of Exhibit 35, active policy holders of Bonnie Roth were contacted on many, if not all of those

---

[1] American Family does not agree that the exhibit contains only the 380 active policyholders designated by Bonnie Roth, but for purposes of this motion, Bonnie Roth's claims are sufficient to show the injunction and TRO were violated.

occasions. *Id.* At the time those contacts were made, the TRO had become an appealable preliminary injunction. See discussion *supra.*

Moreover, counsel had agreed in the course of the hearing that the status quo of no contact with active policy holders would be maintained. Further, a federal magistrate had made findings of fact and law that Exhibit 34 was a protected trade secret of Am Fam. Under such circumstances, whether restrained by the injunction or counsel's agreement, or simply by the law of trade secrets, the Roths were not at liberty to continue unfettered use of Exhibit 34.

On March 23, the defendants produced seven hundred pages of redacted documents which purport to show who received email communications from the defendants and when. Bonnie Roth admitted that as of February 15, 2006 when the contractual one year solicitation period lapsed, she felt she could, and in fact probably did, contact active policyholders of Am Fam. Her reasoning was that the one year non-solicitation period had expired and she was not under any injunction. (Exh. B, pp.86, 100). Despite Mr. Daley's representation in Court, with the Roths present, that he had advised his clients to abide by the TRO until a final ruling was entered on the Magistrate's report, Bonnie claimed she had never been told she was under any injunction. *Id.* at 57.

Prior to February 15, 2006, the die date for the non-solicitation clause, it appears the Roths contacted active policyholders. In their testimony during the discovery for the preliminary injunction, Bonnie Roth testified that she had not added any names to the database since she left Am Fam. (See Exhibit G, pp. 45-46). In a document submitted as part of their response to Am Fam discovery requests, it appears that no new names were submitted to the data base until September of 2006, that document also shows that up until that time, the Roths solicited the names on Exhibit 34[2] See Exhibit F. The records produced by the Roths show that email solicitations of the people on Exhibit 34 began as early as

_____

[2]The size of the Email Concepts Database at the time the Roths left Am Fam appears to exceed 2000 names, but Exhibit 34 of 1847 names has always been the number used.

two weeks after the preliminary injunction hearing and continued regularly until the preliminary injunction was entered in August of 2006. *Id.*

This conclusion can be reached by simple math and by comparing the mailings. Robert Krumroy testified that automatic e-cards could be mailed to either one "category" of email addresses or an entire database, but not to two or more selected categories. (Exh. H, p. 22). On January 31, 2006, an automatic e-card was sent to 2133 email addresses which had to be the entire database, not a single category. Bonnie Roth has testified that she had 11 categories, including active Am Fam policyholders in two categories totaling 380 people, and prospects and inactive Am Fam Customers in one category of 1467 people, the largest single category. (Exh. I).[3] Thus, since the email went to 2133 people, it must have been the entire database. In fact, Bonnie Roth admitted emails over 2000 went to active Customers. (See Exh. B, Tr. 81).

This also means that any email prior to January 31, 2006 which was sent to more than 286 Customers (the difference between 1847 names in Exhibit 34 and 2133, the entire database as of January 31, 2006), went to people listed on Exhibit 34. Further, accepting Bonnie's testimony, for this purpose only, that 380 of the names on Exhibit 34 are active Customers, any email sent to more than 1773 people, was sent to active customers of American Family.[4] Bonnie acknowledged that no new names since leaving American Family had been put into the database through the last week of July, 2005 and names were put in at the rate of one or two a day so the build-up was gradual and reached a total of 800 names over the year and a half. (Exh. B, p. 27, Exh. B-1). For the August 17, 2005 solicitation, 22 days had lapsed since the July testimony. At most, according to her testimony, between 22 and 44 names had been added to the

_____

[3]The first page only of each Am Fam category is provided. The first page reflects the total in each category.

[4]The sum of inactive and prospects plus the 286 new names is 1773.

9

database of 1847 names. Subtracting out the alleged 380 active names, the threshold number of emails before active policyholders were solicited is 1509 to 1531. The email, two weeks post-injunction hearing, went to 1606 people. At least 85-97 active policy holders were solicited.

On February 28, 2006, the Roths sent out an email about homeowners insurance to 2222 people, including active customers of Am Fam, as admitted by Bonnie Roth. (See Exh. B, p. 30). Similarly, based upon a database of 2222 names, the email solicitation on February 23, 2006 regarding speed traps on Chicago freeways went to active customers. (Exh. B, p. 58). The email on April 12, 2006 with an Easter card, the auto insurance email on May 15, 2006 and the Memorial Day card on May 28, 2006 most likely included active customers based on the size of the database and on Bonnie Roth's testimony that after February 15, 2006, she "may" have sent emails to active customers. *Id.* at 81.

Notably on September 17, 2006 the records reflect a drop off in the quantity of people solicited in emails after the preliminary injunction was issued. Also, for the first time the Roths' note "new leads" by each entry. Bonnie Roth could not explain why the words "new leads" appear beside each entry after the injunction was entered. (Exh. B, p. 79). It is, however, obvious that for the first time they were limiting their email solicitations in light of the preliminary injunction.

### B.    RETENTION OF AM FAM MATERIALS.

The Roths are specifically enjoined from possessing or using any material related to American Family's customers. The mere existence of the email database with all of the data from Exhibit 34 violates that provision. The Roths admit to possession of the information and although they claim to have recently deleted the names, the testimony of the founder of the email database is to the contrary. Bonnie Roth testified on April 3, 2007 that she had deleted all the names in Exhibit 34 from her database in February or March, 2007 because she was close to the maximum number of names before a higher price would be charged by the database company. Robert Krumroy, the founder of Email

10

Concepts, testified that the maximum number of names a database can hold is 3500. (Exh. H, p. 20). He testified, looking at the database on his computer that as of April 4, 2007, the Roths' database had 3198 names. *Id.* at 23-24. Since the 800 new leads in the database are input at a rate of one or two a day, new leads cannot account for this large number in the span of a month and a half. (Exh. B, p. 27). Clearly, Exhibit 34 has not yet been deleted despite her sworn testimony to the contrary.

Further in the second session of Bonnie Roth 's deposition on February 12, 2007, Ms. Roth gave her characteristically obfuscating testimony. (See e.g. Exh. J, pp. 42-51). She testified that despite Mr. Daley's representations in open court, he (or his partner) had given her one of the lists that was represented to be in her counsel's custody at the preliminary injunction hearing, Exhibit 35. Exhibit 35 from the preliminary injunction was a 187 page list containing all the active, inactive and prospective policyholders attributed to Bonnie Roth. Bonnie testified that she stayed up all night one night using the list to "identify" active and inactive policy holders, and prospects. (Exh. J, pp. 42, 50-51). She segregated the active policyholders into one category for herself, and one for Connie Roth on the Email Concepts Database. *Id* at 44. Then she created a separate category for inactive/prospects on the Email Concepts Database. *Id.*, pp-50-51. She testified that all of the names on Exhibit 35 were contained in Exhibit 34. She said she delivered Exhibit 35 back to counsel the next day. All of this took place sometime in the third or fourth quarter of 2005. *Id.* at 48. Because she testified that active, inactive and prospects were not segregated into categories on the Email Concepts Database at the hearing on August 3, 2005, this segregation must have taken place post-preliminary injunction hearing. (Exh. A, p. 318).

The list of active and inactive policyholders and prospects remained on Bonnie Roth's computer until the week before her February 12, 2007 deposition, when she printed it out and deleted the electronic copy from her computer for unexplained reasons. (See Exhibit J, p.43; Exh. B, pp. 64-67).

11

The testimony provided by Bonnie Roth on February 12, 2007 made clear that long after the Roths represented that they did not have any documents belonging to Am Fam and long after they were ordered to return all Am Fam Customer information, the Roths in fact had one key document, the 187 page Exhibit 35 which is a complete list of the active, inactive and prospective customers of Bonnie Roth and it was stored electronically on their computer database. In addition, they clearly had additional information from somewhere, because they had the active policy holder list for Connie Roth, which was not part of Exhibit 35. According to the testimony of Bonnie Roth, Bonnie Roth had 64 active customers and Connie Roth had 316 customers. (See Exhibit I). Bonnie Roth's original testimony is that Exhibit 35 contained all of the information for Bonnie and Connie Roth, (Exh. J, pp. 50-51). In fact it was only a listing for Bonnie Roth. (See Exhibit B, pp. 54-55).

Bonnie Roth first asserted that Connie had no role in segregating active and inactive prospective customers for the Email Concepts Database. (Exh. B, p. 14). In her April 3, 2007 deposition, when she realized Exhibit 35 did not include Connie's information, she could not recall how she identified Connie's active customers. She hypothesized that maybe she had a second list from Mr. Daley's partner or that Connie recalled all 316 names from memory. *(See* Exh. B, Tr. pp. 53-56). This was a complete about face in testimony.

Even assuming *arguendo* that Exhibit 35 contained all of the information for both of them as she originally testified, the all night scenario she describes is unlikely. This is so because Mr. Daley's firm, predecessor counsel, filed a motion to clarify in August 2006, up to one year after the all night session, stating:

> "(b) Since Defendants are required to return all materials related to American Family customers, *they will not be able to tell whether a prospective customer is prohibited to them.* If they sell a policy to someone without knowing whether that person is on the list they risk being held in contempt of court. *Defendants must have a list of proscribed prospects* in order to safely comply with this Court's

order without being forced to abandon their profession all together."
(emphasis added) (Docket #73).

Although the motion was eventually withdrawn with the change of counsel, if Bonnie's testimony were accurate, it would never have been filed in the first place because she had all of that information. The similar concerns about not knowing identities raised in the answers to interrogatories that the Roths provided to Am Fam, would not be required if the "Exhibit 35" all night sorting event described by Bonnie were true.

Credibility has been an ongoing issue with the Defendants and this situation is no exception. It is hard to imagine that counsel for the Defendants would give Bonnie Roth Exhibit 35 after counsel's adamant, on the record, representations that there would be no use of the documents on his watch. Further, counsel clearly represented that all documents were either destroyed or returned to counsel, and nothing was in the possession of the Defendants.

The more likely scenario is that the Defendants have retained a copy or some facsimile of the documents taken from Am Fam long after they represented the exact contrary to the Court and counsel. In all events, since the entry of the preliminary injunction in August, 2006, the Roths have had no right to have, or use, any customer list of Am Fam. "Inconsistency and vascillation," when coupled with contrived evidence, that can otherwise easily be obtained, can meet the clear and convincing standard for a Rule to Show Cause. *See, e.g. FTC v. Cleverlink*, 2006 WL 3106448 (N.D. Ill. 2006)(Attachment 1). (See discussion *infra*). In this case, the varied testimony about the comparison and creation of database lists, coupled with the deliberate efforts to obfuscate the date make a rule to show cause proper. The Roths should be brought in on a Rule to Show Cause why they should not be held in contempt for violating the preliminary injunction order.

## C. FAILURE TO DISCLOSE.

Similarly, the Defendants have not complied in providing information about contacts with American Family Customers as required by the injunction. The

Defendants, after multiple promises of compliance, on Friday March 23, 2007, finally produced documents that are purportedly responsive to the requirements of paragraph three of the preliminary injunction requiring that the names of Am Fam customers contacted and the results of the contacts be provided to Am Fam. It is not. The 700 pages of documents include lists of people solicited by the Roths. Those lists redact the identity of all customers, leaving only first names and types of solicitations sent to them. They do not differentiate between any actual active, inactive or prospective customer of Am Fam. They claim some of the lists contain non Am Fam customers. It is impossible to tell what they contain.

In addition, the Roths produced a list of active policy holders of Bonnie Roth and Connie Roth. This list, supposedly downloaded from their email database, is scrambled to be out of alphabetical order. Robert Krumroy, founder of Email Concepts testified that lists are printed off in alphabetical order. (Exh. H, p. 11). Originally, this list omitted names and contained only emails. Eventually, they did provide a list of last names, only in scrambled order. Finally, the list of customers that Bonnie Roth derived from the use of Exhibit 35 and printed in February has not been returned. (Copies of the emails requesting this information are attached as Exhibit K and Exemplar copies of the records produced are attached as Exhibit L.) Movants bring this information to the Court's attention to demonstrate the Roths' deliberate efforts to avoid giving information that is easily obtained in a coherent format. *See Cleverlink, supra.* This obfuscation supports the issuance of a rule to show cause.

### *CONCLUSION*

Because of the Roths' apparent withholding of Am Fam property, repeated contact with Am Fam customers and failure to provide complete disclosure, American Family requests (1) a Rule to Show Cause why the Roths should not be held in contempt; (2) an order requiring Bonnie Roth to produce her laptop for forensic examination to ensure that all lists of Am Fam Customers are permanently deleted; (3) an order requiring the Roths to give Am Fam access to

14

their database to ensure that all Customers of American Family are deleted; and (4) an award of attorneys fees in an amount to be determined, and for such further relief as this Court deems equitable and just.

Respectfully submitted,

AMERICAN FAMILY MUTUAL INSURANCE COMPANY

By:     /s/ Sara E.  Cook

Dated:          April 23, 2007

James P.  DeNardo
ARDC 00614688
Sara E. Cook
ARDC 03126995
McKenna Storer
666 Russel Court, Suite 303
Woodstock, IL 60098
Phone: 815-334-9692
Fax: 815-334-9697
Email: scook@mckenna-law.com

**EXHIBITS TO**
**MOTION FOR RULE TO SHOW CAUSE**

| A | Hearing Transcript of August 2, 2005 |
|---|---|
| B | Bonnie L. Roth Deposition Transcript, April 3, 20070 |
| C | Sample of an Input Screen |
| D | Preliminary Injunction Order |
| E | Motion for Clarification |
| F | Email solicitation list |
| G | Bonnie Roth Deposition Transcript, July 28, 2005 |
| H | Robert Krumroy Deposition Transcript, April 4, 2007 |
| I | Active list of policy holders |
| J | Bonnie Roth Continued Deposition Transcript, February 12, 2007 |
| K | Emails requesting information |
| L | Exemplar copies |
| M | Defendants' Answers to Plaintiff's Interrogatories |
| Attachment A | *FTC v. Cleverlink*, 2006 WL 3106448 (N.D. Ill. 2006) |

# EXHIBIT A

```
1              IN THE UNITED STATES DISTRICT COURT
                  NORTHERN DISTRICT OF ILLINOIS
2                       EASTERN DIVISION

3
    AMERICAN FAMILY MUTUAL INSURANCE   )   No. 05 C 3839
4   COMPANY,                           )   (Judge Guzman)
                                       )
5              Plaintiff,              )
                                       )
6              vs.                     )
                                       )
7   BONNIE L. ROTH, doing business as  )
    Bonnie Roth Agency; CONNIE S. ROTH,)
8   doing business as Connie Roth      )
    Agency; ROTH and ROTH INSURANCE    )
9   AGENCY, INC., doing business as    )
    Roth and Roth Insurance,           )   Chicago, Illinois
10                                     )   August 2, 2005
               Defendants.            )   12:34 P.M.
11
       TRANSCRIPT OF PROCEEDINGS - Preliminary Injunction Hearing
12              BEFORE THE HONORABLE JEFFREY COLE

13  APPEARANCES:

14  For the Plaintiff:        McKENNA, STORER, ROWE, WHITE & FARRUG
                              33 North LaSalle Street
15                            Suite 1400
                              Chicago, Illinois  60602-2610
16                            BY:  MS. SARA E. COOK
                                   MS. KRISTIN DVORSKY TAURAS
17

18  For the Defendants:       NISEN & ELLIOTT
                              200 West Adams Street
19                            Suite 2500
                              Chicago, Illinois   60606
20                            BY:  MR. MICHAEL JOSEPH DALEY
                                   MR. ANTHONY PACKARD
21

22
                      PAMELA S. WARREN, CSR, RPR
23                       Official Court Reporter
                        219 South Dearborn Street
24                            Room 1928
                        Chicago, Illinois   60604
25                          (312) 294-8907
```

247

1  like to start tomorrow.

2       THE COURT: That's fine. Then that's the answer

3  because I said everybody has to agree. So if you don't want to

4  do it, we are not going to do it.

5       And Ms. Roth doesn't feel comfortable, and the hour is

6  late. And I think people should have a -- you know, they

7  should feel alert and awake, and it is a long day.

8       So let's start tomorrow at 8:30, 8:35, 8:40. I have

9  one or two things, but they should be very brief. So we'll get

10  started early.

11       And think about, Ms. Cook, how we can streamline this

12  a bit because we don't need to go through the same things

13  I don't think -- at least in the same degree with her. I -- I

14  can tell from your colleague's -- everything that they are

15  not -- there is really basically very little that isn't agreed

16  in this case.

17       Now, of course, the ultimate conclusions of wrongdoing

18  of course are disagreed. But in terms of who did what, I mean

19  the answer has been extraordinarily, I thought, straightforward

20  and candid. There were no evasions. And I was happily

21  surprised.

22       There is -- I think one of the allegations or

23  one -- yes, one of the allegations that was admitted to is they

24  have solicited people beyond the two folks that are named in

25  the complaint. You know, you don't normally see that kind of

248

1  straightforwardness. So it is quite refreshing. So I don't

2  think you'll have a problem streamlining this. But again, as I

3  say, I don't want to do anything that's going to constrict

4  needlessly your presentation.

5       And you can -- you can leave whatever you want to

6  leave in the courtroom tonight because I -- you don't want to

7  drag this stuff around. And I really don't think this is the

8  kind of stuff that -- I mean, I know that there is

9  confidentiality, but the courtroom is locked, and I don't think

10  anybody cares about this stuff. Nobody is going to break in

11  here to steal --

12       MR. PACKARD: A box of paper.

13       THE COURT: -- boxes of paper, exactly.

14       MS. COOK: Okay.

15       THE COURT: All right. So with that we will adjourn

16  till tomorrow at 8:30. And have a good evening, everybody.

17       MR. PACKARD: Thank you, your Honor.

18       MS. COOK: Thank you, Judge.

19       THE COURT: Okay.

20       MS. TAURAS: Judge, as far as your exhibits go, do you

21  want me to go ahead and put them back into the boxes in some

22  kind of order so that we can start off fresh tomorrow?

23       THE COURT: Yeah, you know that would be terrific.

24  And at least if you can -- I mean, you can leave everything

25  here in the courtroom. But I think we need to have the tables

249

1  at least a bit orderly for whoever else comes in tomorrow.

2       MR. DALEY: Judge --

3       THE COURT: Because they might want to steal this

4  stuff.

5       MR. DALEY: I know what the Court had stated earlier

6  about the schedule and having to be someplace on Sunday. Did

7  the Court say, and I want to be sure about this, that you

8  wanted proposed findings of fact and conclusions of law by the

9  close of business tomorrow?

10       THE COURT: Yeah, I mean we have to do that. And I

11  would like you folks to work together -- I don't want to

12  have -- otherwise this is not going to get done. If it doesn't

13  get done, what's going to happen is that -- when is the ten

14  days up on the extension?

15       MS. COOK: Your Honor, the ten days is up today.

16       THE COURT: Okay. Well -- remember I asked you to

17  look at Judge Easterbrook's decision? And he thinks, and he is

18  not wrong about much, that temporary restraining orders after

19  20 days automatically turn into preliminary injunctions. So as

20  a practical matter it doesn't affect you folks because you're

21  operating under some sort of injunction. Whether you term

22  it -- I mean, ultimately I'm going to make a

23  recommendation -- but for right now, as of tomorrow, you're

24  under a slightly different form of injunction. But it is a

25  theoretical matter.

250

1       But I -- you know, I know you want to get this done

2  and get this on to Judge Guzman one way or the other. And

3  while he's considering this, of course, you're going to be

4  under this injunction. So I -- if I can't get this done,

5  you're going to have an extra week that you really don't want.

6       MR. DALEY: No one is more concerned about that than

7  we are, your Honor.

8       THE COURT: Right.

9       MR. DALEY: But I'm just wondering about the timing of

10  all of this and being able to get you paper by the end of the

11  day --

12       MR. PACKARD: Right.

13       MR. DALEY: -- tomorrow. It is very difficult from

14  our end.

15       MR. PACKARD: We'll work tonight.

16       MR. DALEY: We'll do our best, your Honor, and advise

17  the Court tomorrow.

18       THE COURT: I mean to a certain -- well, look, I

19  can -- there are things that I can do -- but you're not going

20  to want to do this. There are things that I can do by

21  telephone. And I have drafts. I -- the way I function --

22  Sonya, this doesn't have to be on the record.

23       (Discussion off the record.)

24       (Adjournment at 6:14 P.M. to reconvene at 8:30 A.M.,

25  August 3, 2005.)

```
 1              IN THE UNITED STATES DISTRICT COURT
                 NORTHERN DISTRICT OF ILLINOIS
 2                      EASTERN DIVISION

 3

 4   AMERICAN FAMILY MUTUAL INSURANCE    )  No. 05 C 3839
     COMPANY,                            )  (Judge Guzman)
                                         )
 5            Plaintiff,                  )
                                         )
 6            vs.                         )
                                         )
 7   BONNIE L. ROTH, doing business as   )
     Bonnie Roth Agency; CONNIE S. ROTH, )
 8   doing business as Connie Roth       )
     Agency; ROTH and ROTH INSURANCE     )
 9   AGENCY, INC., doing business as     )
     Roth and Roth Insurance,            )  Chicago, Illinois
10                                        )  August 3, 2005
              Defendants.                 )  8:35 A.M.
11
        TRANSCRIPT OF PROCEEDINGS - Preliminary Injunction Hearing
12               BEFORE THE HONORABLE JEFFREY COLE

13   APPEARANCES:

14   For the Plaintiff:         McKENNA, STORER, ROWE, WHITE & FARRUG
                                33 North LaSalle Street
15                              Suite 1400
                                Chicago, Illinois  60602-2610
16                              BY:  MS. SARA E. COOK
                                     MS. KRISTIN DVORSKY TAURAS
17

18   For the Defendants:        NISEN & ELLIOTT
                                200 West Adams Street
19                              Suite 2500
                                Chicago, Illinois   60606
20                              BY:  MR. MICHAEL JOSEPH DALEY
                                     MR. ANTHONY PACKARD
21

22
                         PAMELA S. WARREN, CSR, RPR
23                        Official Court Reporter
                         219 South Dearborn Street
24                              Room 1928
                         Chicago, Illinois   60604
25                           (312) 294-8907
```

Closing - Daley                                            424

1  a restrictive covenant against competition.

2      The situations are when there is a near permanent

3  customer relationship, that doesn't exist here, or when there

4  are trade secrets or confidential information which are

5  involved, this isn't an abstruse concept in the sense that

6  there are important public policy reasons for this rule. It is

7  important for us as a society to have people alienate and work

8  and move about. It is also important to us.

9      And I don't want to devolve into Judge Posner's realm

10  here, but it is important from an economic standpoint that

11  people have access to services in an efficient way. And that's

12  not abstruse either because we have seen it in this case.

13  People want to go with someone who is able to provide the same

14  service at a lower price. That's what's makes these wheels

15  grind. It is an important thing. And it is a public policy

16  decision that is incorporated into this rule of law.

17      That is why restrictive covenants are disfavored.

18  That's why in Wisconsin in particular restrictive covenants are

19  disfavored, and they have to meet certain criteria. And the

20  first hurdle that we have to establish is is there a

21  protectable interest. It only exists in trade secrets or

22  confidential information.

23      Our customer lists -- and in particular, I don't want

24  to overstate what Exhibit 34 is. And are we contending that

25  Exhibit 34 is the only thing that's at issue in this case.

Closing - Daley                                            425

1  Exhibit 34 --

2      THE COURT: And it is because you say everything has

3  been returned or destroyed.

4      MR. DALEY: That is correct, your Honor. And

5  certainly there has been no competent evidence to the

6  contrary.

7      Exhibit 34 is the only thing that's in issue in this

8  case. Whether the list was developed by -- or whether it

9  consists of 85 percent prospects or whether it consists of 85

10  percent active policyholders doesn't matter. If it was 100

11  percent active policyholders, it does not constitute a trade

12  secret under applicable law.

13      What are the reasons for that? Well, trade --

14  customer lists are kept in the ordinary course of business.

15  There is nothing particularly special about them. And in the

16  case of Exhibit 34, it doesn't even come close to rising to the

17  level of the cases which have upheld the transfer of customer

18  lists or the use of customer lists. In particular, I'm

19  referring to the case of Corroon & Black versus Hosch.

20      THE COURT: That's not the test anymore. The Supreme

21  Court of Wisconsin has said in Minuteman --

22      MR. DALEY: Well --

23      THE COURT: -- it expressly referred to Corroon and

24  said it is no longer the test for the definition of a trade

25  secret.

Closing - Daley                                            426

1      MR. DALEY: As this Court has already read, it is used

2  as a helpful guide still, even to this day. But now I'm glad

3  that Court has brought --

4      THE COURT: The restatement --

5      MR. DALEY: -- up the Minuteman case.

6      THE COURT: -- factors are helpful. The test in

7  Corroon has had been flatly rejected. At least the Supreme

8  Court has said it. The exact words are, the test in Corroon is

9  no longer the definition of a trade secret.

10      MR. DALEY: Correct. But the test that Corroon used

11  was the restatement test, was the restatement factors, the six

12  factors in the restatement. And they said that the Court

13  is -- that those restatement factors are still helpful. I am

14  not disagreeing with the holding of Minuteman in this case.

15  And, in fact, I embrace the holding of Minuteman, and I want to

16  tell you why.

17      The holding in Minuteman didn't say that customer

18  lists were per se trade secrets, and they didn't say that they

19  were per se not trade secrets. What it said was that in

20  this particular case, circuit court or district court, you have

21  used the inappropriate test.

22      THE COURT: Okay.

23      MR. DALEY: You have used the Corroon & Black test.

24  Now we have the Uniform Trade Secrets Act, and we want you to

25  apply that test. And in doing that they made a citation to an

Closing - Daley                                            427

1  Indiana case. And even in the Minuteman case they cited the

2  Wisconsin statute that says, we need to make uniform the laws

3  of the states when it comes to the Uniform Trade Secret Act.

4  And the case that they cited was the Steenhaven case. And if

5  I could, I would like to give that to the --

6      THE COURT: No, I have got it. I have read it. You

7  don't have to give it to me. I know what it says.

8      MR. DALEY: Steenhaven is almost identical to the case

9  that we have here. The facts that are contained within that

10  case are incredibly similar, except for the fact that the

11  Steenhaven case had more information contained on it than what

12  we have in Exhibit 34.

13      Here's what the Court said, the Indiana court in

14  Steenhaven said. Policyholder lists are not readily

15  ascertainable from the policyholders themselves. This is an

16  argument we have heard consistently from the plaintiffs in this

17  case. That's the value they say. The fact that they are

18  simply customers of American Family makes it valuable.

19      We are nevertheless unable to conclude that the

20  policyholder list in the instant case is a trade secret under

21  the Act. And again they are applying the Uniform Trade Secrets

22  Act in this case.

23      No inherent independent value can be ascribed to this

24  list of policyholders's names and addresses. Again we don't

25  even have addresses here. These are email addresses.

Closing - Daley                                                          428

1   Even if such list is placed in the hands of a rival
2   insurance organization, alone it is effectively worthless.
3   Lacking independent economic value in the hands of another, we
4   cannot say that such a list would constitute a trade secret
5   within the meaning of Uniform Trade Secrets Act.
6       The language that was quoted in Minuteman was
7   contained in a footnote, Footnote 5, in the Steenhaven
8   decision. And the language as quoted, the Court has already
9   read, but the footnote goes on as follows: As regards the
10  instant case, we note that personal insurance is sold to a wide
11  group of purchasers and sold in a great variety of policy
12  combinations based upon individual policyholder's needs.
13  That's why a trade -- a customer list of this type simply isn't
14  a trade secret.
15      If further proof is needed as to the importance of the
16  law and importance of the analysis, I would submit this
17  Court's -- to look at a -- Judge Bauer's very insightful
18  opinion in the Nalco case, which we have cited in our brief.
19  In Nalco Judge Bauer found that the market needs to be fixed,
20  and the market needs to be small before a customer list can be
21  considered a trade secret under the Uniform Trade Secrets Act.
22      THE COURT: Isn't that precisely the opposite of the
23  reason that Minuteman reversed? It is because the market was
24  small and thus readily ascertainable. It strikes me that there
25  is an enormous tension giving a literal reading to Judge

Closing - Daley                                                          429

1   Bauer's decision, which I should tell you if you go look at it,
2   actually has a terrible -- it has got a mistake. It cites the
3   Indiana Supreme Court's language and it says it came out of the
4   statute, and it didn't.
5       MR. DALEY: Well --
6       THE COURT: But, anyway, if you go back and look -- it
7   is an interesting mistake. He --
8       MR. DALEY: And in Nalco he was concerned with
9   Wisconsin law, but he did make the --
10      THE COURT: Yeah, it says the Indiana statute says,
11  and then it cites the language from Nalco.
12      But, in any event, it strikes me that there is a huge
13  built-in conflict intention between the two propositions that
14  you have just -- now your absolute reporting of the cases,
15  Mr. Daley, is perfectly accurate and scholarly. But when I
16  thought about it, isn't there a tension between saying on the
17  one hand that the cooking business or the grease business it is
18  not a trade secret because anybody -- it is a small -- I forgot
19  the word she just used -- but it is a small --
20      MR. DALEY: Fixed.
21      THE COURT: -- fixed product --
22      MR. DALEY: Actually they use small and fixed.
23      THE COURT: All right. Small and fixed kind of
24  product market and geographic market as well. You can just
25  pick up the phone book and look. Well, how in the world can

Closing - Daley                                                          430

1   that possibly be entitled to a trade secret? And the position
2   just says, well, it is because it is -- it is only when it is
3   fixed and small that it can be entitled to a trade secret
4   status.
5       MR. DALEY: Well, that's the Burbank decision, Judge,
6   with the grease case, and that --
7       THE COURT: Well, whatever.
8       MR. DALEY: Yeah. And certainly in that decision the
9   Court found it was not a trade secret because of the factors
10  that were contained in the Uniform Trade Secrets Act. That was
11  a customer list situation. And that case was a little bit
12  complicated by the fact that there was the theft of a secret --
13  I'm sorry, your Honor, I'm conflating that with another case.
14      THE COURT: No. There is a lot of cases, I know.
15      MR. DALEY: But --
16      THE COURT: But you see my point.
17      MR. DALEY: I do see your point.
18      THE COURT: Regardless of what the names of the cases
19  are, to say on the one hand that it is not a trade secret
20  because the market is small and the customer, universe of
21  customers is thus readily ascertainable, and on the other hand
22  to say the universe -- in order to have trade secret protection
23  you must have a small universe of customers, it strikes me
24  there is an inherent tension between those two propositions.
25      MR. DALEY: Well, Minuteman, as the Court wells knows,

Closing - Daley                                                          431

1   didn't decide either of those issues. I mean, it basically
2   sent it back down for reconsideration --
3       THE COURT: No --
4       MR. DALEY: -- based on the Act.
5       THE COURT: There is certainly a message in the case.
6   This wasn't like a steamship that was good for a long journey
7   only. That's not how courts function.
8       I just -- I think if you look at the whole revisionist
9   spirit in which the Wisconsin legislature acted, it was
10  designed to get rid of those sort of a priori decisions that
11  said a customer list essentially just isn't -- really what you
12  are saying -- just isn't entitled to trade secret protection.
13  And you may be right. That -- maybe that's a better commercial
14  rule. But I thought the Wisconsin court and the Wisconsin
15  legislature was sending a very different message.
16      MR. DALEY: Well, if it is, I am surprised that they
17  cited Steenhaven to deliver that message. Because that case is
18  directly on point. And it is directly contrary. And if the
19  message is going to be sent that's out there, it is give it
20  careful consideration and consider the type of case that is
21  coming through.
22      The question is a matter of law, but it is obviously
23  one that's derived from the facts of the particular case. In
24  this particular instance -- and Nalco provides guidance on this
25  as well -- we're not selling gyroscopes. You know, this isn't

Final - Cook                                                                456

1    THE COURT: I mean, your reading is as, you know, as

2  good as mine.

3    MS. COOK: Anyway, your Honor, that was the basic

4  point I wanted to make.

5    So unless the Court has further questions --

6    THE COURT: No, I don't.

7    MS. COOK: That's okay.

8    THE COURT: But I really -- I -- one, I want to just

9  say I feel very badly for the Roths that they are in this

10 position. I'm really very sorry for you, and I certainly wish

11 you the best. And it is unfortunate that these kinds of thing

12 happened.

13   And I want to thank the four of you for your really

14 extraordinarily articulate and reasoned presentations. They

15 are of enormous value and help, and I'm very grateful. So

16 thanks.

17   MS. COOK: Thank you, Judge.

18   THE COURT: Okay.

19   MS. COOK: Thank you.

20   THE COURT: Oh, when we have to reconvene. I forgot.

21 Otherwise this is all an exercise in futility.

22   Let's come back -- I have got an enormous amount of

23 work to do between now and Friday because I want this to go to

24 Judge Guzman on Friday. Why don't you come back Friday at

25 2:00.

---

457

1    MS. COOK: Okay.

2    THE COURT: If for some reason I haven't finished,

3  then I won't get this to him until Monday morning, but he'll --

4  you'll be done with me no later than Monday.

5    MS. COOK: Okay.

6    THE COURT: But I'm going to try for Friday.

7    Now I think -- I mean, I'm not -- I really -- I take

8  Mr. Daley at what he said. It really would be insane for

9  Bonnie and Connie Roth to be fooling around at this point in

10 time. I think there probably is injunctive relief. And if

11 Judge Easterbrook's opinion is right, this has turned into a

12 preliminary injunction. And I think your folks ought to

13 conclude that they are still under order of the court not to do

14 what the TRO did.

15   MR. DALEY: We have so advised them.

16   THE COURT: And I will take you all at your word that

17 this -- nothing is going to happen between the time Judge

18 Guzman gets this and he makes a decision one way or the other.

19 And I am confident that isn't going to happen. I assume you

20 have that confidence as well --

21   MS. COOK: Yes, your Honor.

22   THE COURT: -- Ms. Cook?

23   MS. COOK: If counsel has represented that --

24   THE COURT: Yeah, and I --

25   MS. COOK: -- I am perfectly comfortable.

---

458

1    THE COURT: They look like they are just not going to

2  do anything crazy.

3    MS. COOK: No. I --

4    THE COURT: So -- okay. So the status quo at least

5  will remain. And to the extent that that inhibits them, I'm

6  really sorry.

7    Okay. Thank you all very much.

8    MS. COOK: Thank you, Judge.

9    (Which concluded the proceedings in the above-entitled

10 matter.)

11

12              C E R T I F I C A T E

13

14   I hereby certify that the foregoing is a transcript of

15 proceedings before the Honorable Jeffrey Cole on August 2 and

16 3, 2005.

17 DATED: August 22, 2005

18

19

20

21

22

23

24

25

B. Roth - cross by Packard                                           301

1   A. And that given the telephone do not call and different
2   things today you have to start marketing differently.
3   Q. Okay. And who is the founder?
4   A. Robert Krumroy, K-r-u-m-r-o-y.
5   Q. Okay. And did you then contact him and set up a program
6   for your agency?
7   A. Actually at this -- at the meeting we spent some time
8   discussing it, and then I contacted him later.
9   Q. Okay. So for how long have you then been using this
10  web-based program?
11  A. About two and a half years.
12  Q. Okay. And I believe it was Exhibit 34, the list of the
13  various email addresses. Those are all of the people, at least
14  as of the time that was printed, all the people on your
15  web-based system?
16  A. Yes, over the two-and-a-half-year period.
17  Q. Okay.
18      MS. COOK: I'm sorry, I couldn't hear that.
19      THE WITNESS: Over the two-and-a-half-year period.
20      MS. COOK: Thank you.
21  BY MR. PACKARD:
22  Q. And how was that list then compiled?
23  A. What I would do is through the various vendors that I
24  subscribed that I purchased leads from, like Zip Search,
25  I-Leads, Go-Leads -- there was a number of them, between ten to

B. Roth - cross by Packard                                           302

1   twelve vendors that I purchased leads from -- those leads would
2   come into me, and it would include a lot of information,
3   depending on -- if it was an auto lead, health lead, it would
4   give health information, date of birth.
5       Auto lead would give vehicle identification number,
6   date of birth, driver's license, et cetera. I would first
7   input that into my Email Concept.
8   Q. Input what? How much of that information would be put in?
9   A. Just the name and email address. Sometimes I put the
10  address and telephone number --
11  Q. Okay.
12  A. -- but not always.
13  Q. And was this on a daily basis or how often would you get
14  these names from the various vendors?
15  A. It would come on a routinely basis. Sometimes I would get
16  two or three a day. Other times I wouldn't get any that day,
17  and the next day I would get two or three.
18  Q. When you say two or three, do you mean --
19  A. Two or three --
20  Q. Two or three mailings or two or three names or --
21  A. Two or three names, leads.
22  Q. Okay.
23  A. And those same leads would go to various other competitive
24  agents.
25  Q. That was my next question. Were these names or leads

B. Roth - cross by Packard                                           303

1   available to other people?
2   A. Yes. Several other competitive agents would get that same
3   information.
4       THE COURT: Ms. Roth, who paid for this? Did you? Or
5   were you reimbursed by the company?
6       THE WITNESS: I paid about $7000 -- it was an average
7   of $7000 a year.
8       THE COURT: And were you reimbursed by American
9   Family?
10      THE WITNESS: No.
11  BY MR. PACKARD:
12  Q. Now after you put the contact information, whether it was
13  email, phone or address, into your web-based system, did you
14  contact these people in any way?
15  A. The next step I did, I would either email them or call them
16  to reconfirm the information that they had sent me because
17  sometimes these leads that you would get would be school
18  projects, and you would just be wasting your time.
19  Q. And what are --
20  A. And then I -- and then I would call them and ask them for
21  additional information. I would email them and reconfirm or
22  ask for additional information and --
23  Q. And would you keep that additional information separately
24  from the web list, the web data?
25  A. I would just make notes on the piece of paper that I

B. Roth - cross by Packard                                           304

1   printed off that showed the lead on it.
2   Q. Okay. So you would make some notation on the sheet that
3   you had received electronically --
4   A. Yes.
5   Q. -- from the vendor.
6   A. Yes.
7   Q. Okay. Was any of this additional information put into your
8   web system?
9   A. No. The whole purpose of that was for email marketing, to
10  start to build a relationship.
11  Q. Okay. And after you had contacted these people and you had
12  gotten some confirmation or clarification, then what would you
13  do with the names?
14  A. I would then input it into -- I would then determine -- I
15  mean, if it was a valid lead, I would do a quote and then put
16  it into the American Family system to do a quote.
17  Q. Would you make a determination whether American Family even
18  had a product that they might be able to buy?
19  A. Well, yeah, that would be the first -- first step to
20  determine if it was a product that was suitable that American
21  Family sold or if it was -- if it fell into the residual
22  markets, if it was a product that we did -- couldn't even
23  offer.
24  Q. Okay. Now when you first contacted any of these people
25  either by email or phone, how did you identify yourself?

B. Roth - cross by Packard          317

1  Q. So every email you sent based on that web list --

2  A. Yes.

3  Q. -- had an opt out --

4  A. According to the --

5  Q. -- provision.

6  A. Anti-spamming guidelines you have to put a link in there to

7  opt -- to give the client or prospect an opportunity to opt

8  out.

9  Q. Okay. So when you heard the testimony yesterday that 85

10 out of a hundred, the first hundred, on that list were active

11 policyholders, do you see any way that this can be true?

12 A. I don't know because I don't know what list they were

13 looking at and what they were comparing it against. You know,

14 because, again some of them could have been active that would

15 have inactive. Some of them could have been -- most of them

16 were prospects that never took an American Family policy, but

17 they remained a prospect.

18      So it is really hard to determine.

19 Q. When you say never took an American Family --

20 A. I would say it would probably be the opposite. 85 percent

21 of them were prospects that never took an American Family

22 policy.

23 Q. When you say never took an American Family policy, you mean

24 you never sold them an American Family policy.

25 A. That's correct. That's correct.


B. Roth - cross by Packard          318

1  Q. Would you know whether somebody else in New Jersey had sold

2  them an American Family policy?

3  A. I have no idea.

4  Q. Okay. In fact on your web system does it distinguish -- is

5  there any way of distinguishing between prospects, inactive

6  policyholders, and active policyholders?

7  A. No.

8  Q. Is there any insurance information at all on your web-based

9  list?

10 A. Absolutely not. It is just for the purpose of email

11 marketing, name, email address --

12 Q. Contact.

13 A. -- and sometimes I put the address in.

14 Q. Okay.

15      MR. PACKARD: Could I have just a minute, your Honor?

16      THE COURT: Sure.

17 (Brief interruption.)

18 BY MR. PACKARD:

19 Q. Out of all of the printout lists and other information of

20 all the lists and documents that had been produced here,

21 including the -- I believe it is Number 34, the 1847 names,

22 what, if any, of them do you want to use in running your

23 business?

24 A. I don't need any of the printout list from American

25 Family's database.


B. Roth - cross by Packard          319

1  Q. Uh-huh.

2  A. They can have all of those back.

3  Q. What is the only thing that you want then?

4  A. I -- it is the email -- my own email database that I paid

5  for and compiled and continue to pay for.

6  Q. And that exhibit number is Number 34, is that correct?

7  A. That's correct.

8  Q. Do you have it in front of you?

9  A. No, I don't, but I remember it.

10 Q. I'll hand you what has been previously marked as Exhibit

11 34.

12 A. Okay.

13 Q. And is that the web-based list you're referring to?

14 A. Yes, this is my web-based list.

15 Q. Thank you.

16      THE WITNESS: Do you want to see it?

17      THE COURT: Could I just for a second?

18 BY MR. PACKARD:

19 Q. That exhibit also has a letter you sent.

20      THE COURT: Right, exactly.

21      Thank you, Ms. Roth.

22      MR. PACKARD: I don't think I have any further

23 questions, your Honor.

24      THE COURT: Thank you, Mr. Packard.

25      MS. COOK: Your Honor, I do have questions. But I was


B. Roth - cross by Packard          320

1  wondering if we could take a -- just a five-minute break

2  because I have got to coordinate information from a couple of

3  different exhibits.

4      THE COURT: Why don't we take a 15-minute break.

5      MS. COOK: Very well.

6      THE COURT: And that way you'll be sure to have enough

7  time.

8      MS. COOK: Great. Thank you, Judge.

9      THE COURT: Okay.

10 (Discussion off the record.)

11 (Brief recess.)

12      THE COURT: Thank you, all.

13      Was that enough time, Ms. Cook, or do you need more?

14      MS. COOK: Yes, your Honor. I'm fine.

15      THE COURT: Thank you.

16      REDIRECT EXAMINATION

17 BY MS. COOK:

18 Q. We were -- there was some testimony about people switching

19 policies a few minutes ago. If the person has a policy, is the

20 easiest time to change the policy when the policy lapses or

21 comes up for renewal?

22 A. It is -- that's a personal opinion.

23      MR. PACKARD: I'd ask the witness --

24      THE WITNESS: That's a personal --

25      MR. PACKARD: -- to keep her voice up.